Barnet, J.,
delivered the opinion of the court:
This case now comes before this court upon motions for a new trial by both parties. Upon the hearing of these motions a new trial was allowed, and the whole case was heard and considered on its merits. The former findings and opinion have been withdrawn and new findings made, and this revised opinion is submitted.
This is a suit to recover damages for the “ taking ” of the lands of the claimants by the Government in the construction of the improvements on the Mississippi River. The claimants are the owners of a plantation containing about 6,000 acres in the State of Arkansas and situated within a bend on the Mississippi River and comprising nearly all of the land within said bend. Before the Government began its improvements upon this river the local authorities at different points along its course below Cairo, Ill., had built levees, the purpose of which was to prevent the river at its high stages from overflowing the lands in their rear. It does not appear that these locally constructed levees materially raised the flood of the river at any point, but that the surplus waters found their way through numerous openings into basins of large area, and thence into the Gulf. During periods of high water the lands of the claimants had always been subject to occasional overflow, but not to such an extent as to materially impair their value. The levees constructed by local authorities, and afterwards adopted and added to by the Government, as hereinafter stated, were located at places considerably back from the river, so as to leave between them and the river, or, as might be said, between the levees on both sides of the river, lands which were not affected by them unless the flood tide of the river was permanently raised. The lands in question in this case belonged to that class.
Before the Government began its improvements the local authorities had built a levee, a fragment of which is shown upon the map following, and which it will be seen was situated somewhat back from the claimants’ plantation and from the narrow neck of land joining their plantation to the mainland.
*260 In 1883 the Government began the work of improving the navigation of the Mississippi River and has continued it ever since. The plan adopted seems to have been to adopt the local levees as far as practicable from Cairo down, to build new levees in intervening spaces, and thus unite them into one complete system for raising the waters of the river by confining it within a narrower channel and preventing its partial escape into the basins before mentioned. This object has been and is being further accomplished, and it appears that its waters have thus been raised approximately 6 feet in times of high water. This result has been to greatly improve and raise the value of much territory outward from this system of levees, but to cause more frequent overflow of the lands left between them and the river. It appears, however, that, notwithstanding this apparent result of the river improvements, the plantation of the claimants was sufficiently above the flood tide of the river to remain valuable agricultural lands and to be subject only to occasional overflow.
It appears that in 1903-4, in order to prevent threatening danger to the levee near the neck of land connecting the plantation of the claimant and the mainland, as well as to preserve the integrity of the neck of land itself and prevent the river from cutting through it, the Government constructed a “dike,” hereinafter called the Leland Dike, running diagonally out from the main line of the levee and extending 662 feet upon the Chicot plantation. In the period of high water of 1904 this dike was partially destroyed and claimants’ plantation considerably injured, whereupon in 1907 the Government extended said dike farther to the northeastward, and so far that it went 2,700 feet still farther into and upon the claimants’ plantation. The effect of said dike at times of high water is to deflect the flood water’s of the river to the eastward over and across a large portion of claimants’ plantation in such volume and with such force as to scour out and destroy much of its top soil, wash away the tenant houses which were situated thereon, and leave a deposit of sand and gravel on its surface, which has already totally destroyed its value for agricultural purposes (and it has no other); and it is unneces *261 sary to state that this deposit will increase from year to year.
This description of the locus in quo will be better understood by an examination of the map herein. The land to the northeast of the line marked “Leland line” is the-farm of the claimant, the line colored yellow is the levee, and the pink line A-B is the dike mentioned. The land submerged with sand and gravel is situated within the fretted dark line northeastward of the dike.
From this statement it will be seen that there is no question but that this land so destroyed has been “ taken ” within the meaning of the fifth amendment to the Constitution, and the only question before us is whether the Government is liable for this taking.
It is contended by the Government that it is not liable for this taking of the claimants’ lands for the reason that the levees in question were pai’tly constructed by the local authorities, so that the taking was not alone by the United States, but jointly with others. It is argued that such a joint taking is not a taking by the United States within the meaning of the amendment referred to. While the findings show that Point Chicot plantation was more frequently and deeper overflowed in consequence of the extension of the levee system by the United States, no part of it was destroyed nor materially damaged until the dike was extended and erected. Hence it can not be said that claimants’ land was taken in consequence of the levee system, but directly in consequence of the erection of the dike, and that was the work of the United States alone. In this connection it should also be remarked that the levee system as constructed and kept up by the local authorities had not materially damaged these lands, and it was not until this system had reached “the state of completion which now exists” and said dike had been erected that they •were inundated with sand and gravel. (Findings II and VI.) Hence, both by the construction of the dike and the completion and joining as a whole of this levee system, the United States alone has taken the claimants’ lands. This joining .of the locally constructed levees and erection of the dike was in furtherance of the Government project alone — the *262 confinement of the river within its banks and thereby to improve navigation:
At the time of the erection of the Leland Dike the injury to the plaintiffs’ land, which had theretofore been caused by the joining of the levee system, was consequential only and had not amounted to a taking, and hence is immaterial to be computed in this case, the Government’s liability beginning at the time of its absolute destruction. It is true that the flood heights of the Mississippi River had been raised by the joining together as a whole of the levee system, and that this fact made the erection of the Leland Dike more destructive to the plaintiffs’ land than it otherwise would have been, but the findings show, and it is not denied, that the erection of the dike was the proximate cause of the flooding of Chicot plantation with sand and gravel. It would be a travesty upon justice to maintain that the Government is exempt from paying for this destruction because some prior injuries inflicted, not amounting to a taking, had accelerated and assisted in this destruction.
There may well be other cases where the overflow and damage are directly caused by the joint action of the Government and local authorities, and in such cases the question raised by the Government will arise and must be decided, but for the reasons given is not believed to be in this case.
It is further contended by the Government that this case comes within the decision of the Supreme Court in the Bedford case (192 U. S., 217), and that under that decision the petition should be dismissed. In that case a revetment was constructed by the Government authorities along the banks of the Mississippi River at Delta Point, La., for the purpose of preventing the further erosion of that point. As a result of this revetment the integrity of the bank at that point was maintained, and the channel and current of the river were gradually directed toward the lands of the claimants situated about 6 miles below, and after the expiration of several years eroded and overflowed about 2,300 acres of their lands. In the opinion in that case it is said:
“* * * The object of the works was to preserve the conditions made by natural causes. By constructing works to secure that object appellants contend there was given to *263 them a right to compensation. The contention asserts a right in a riparian proprietor to the unrestrained operation of nantral causes, and that works of the Government which resist or disturb those- causes, if injury result to riparian owners, have the effect of taking private property for public uses within the meaning of the fifth amendment of the Constitution of the United States. The consequences of the contention immediately challenge its soundness. What is its limit? Is only the Government so restrained? Why not as well riparian proprietors; are they also forbidden to resist natural causes, whatever devastations by floods or erosion threaten their property? Why, for instance, would not, under the principle asserted, the appellants have had a cause of action against the owner of the land at the cut-off if he had constructed the revetment? And if the Government is responsible to one landowner below the works, why not to all landowners? The principle contended for seems necessarily wrong. Asserting the rights of riparian property it might make that property valueless. Conceding the power of the Government over navigable rivers, it would make that power impossible of exercise, or would prevent its exercise by the dread of an immeasurable responsibility its exercise by the dread of an immeasurable responsibility * *
In accord with the rule of law thus stated it would have been within the rights of the claimants to have constructed this dike if necessary to protect their lands from the ravages of the river, or for the Government to have constructed like works along the banks of the river for the improvement of navigation. But it seems to us an entirely different thing and not within the principle laid down in that case for the Government to invade the lands of the claimants and construct a dike thereon more than a quarter of a mile from the bank of the river, extending upon the same over 3,000 feet and covering more than 31 acres of land. It appears that this was done for the purpose of protecting the levee at the inner end of the dike, as well as to prevent the river from cutting through the narrow neck of land at that point, and if it had -resulted in causing the overflow and taking of other lands than the claimants’ situated farther down the river, the parties thus injured would have been without redress under the decision in the Bedford case. *264 But in the case at bar it is admitted that the Government went upon the lands of the claimants and took possession of more than 31 acres, and constructed thereon a work which directly caused the taking of 3,664.6 acres more. We think it is not and can not be denied that the Government is clearly liable for the taking of this 31 acres; and if so, why is it not just as liable for the taking of the balance which was the result of the first taking? In fact, it may be said all of the lands mentioned were taken at the same time and by the same act.
We believe that the rule laid down in the recent case of United States v. Grizzard (219 U. S., 180) is particularly applicable to this case. In that case there was an undisputed actual taking of a part of the farm of the defendant in error by permanently flooding the same, and, as an incident of such flooding, a public road running across the flooded part was also flooded. The court below had divided the damage by reason of the flooding of a part of the farm and the destruction of the easement, allowing $750 for each. The Supreme Court affirmed this judgment, and in so doing established the rule that—
“ Whenever there has been an actual physical taking of a part of a distinct tract of land the compensation to be awarded includes not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking, embracing, of course, injury due to the use to which the part appropriated is to be devoted.” (Id., 183.)
As before stated, in the case at bar it is undisputed that the Government has taken actual physical possession of 31 acres of the plaintiff’s farm, and the findings show that such taking has entirely destroyed the value of a large part of the remainder; and whether or not it is conceded that this absolute destruction of value by itself alone,, is a taking within the meaning of the fifth amendment of the Constitution, it will not be denied th'at this destruction of value resulted from the actual physical taking of the 31 acres. The same principle is recognized in Sharp v. United States (191 U. S., 341) and Welch v. United States (217 U. S., 333).

*0

*265 •In the decision of this case it may be admitted that if the Government had owned the site of the Leland Dike at the time of its erection, or if it had been owned by a stranger to this suit, and hence had made no invasion upon the lands of the plaintiff, it would not have been liable for the destruction thereby inflicted, under the ruling in the Bedford case. Under the decisions of the Supreme Court in all cases of this character, it is the invasion upon the lands and the actual and visible possession which constitutes the taking, and when thus taken all of the consequences incident to such invasion necessarily follow, among which is the liability to pay for the damage thereby occurring to the balance of the tract to which the land thus taken belongs. What is the difference in principal in cutting off a right of way, as in the Grissard case by inundating it with water, and in covering the balance of the tract with sand and gravel as in the case at bar? In both cases the invasion of the plaintiffs’ lands was the proximate cause of the additional injury.
The case of Barden v. Portage (79 Wis., 126; 48 N. W. R., 210) is identical in principle with this case. In that case a levee was constructed on the plaintiff’s land upon the Wisconsin River, and terminated at a point thereon, the result of which was to gather the waters of the river and deflect them at this point of termination over and upon the plaintiff’s land and thereby cover it with sand and gravel. It was unanimously held in that case that the defendant was liable for damages thus ensuing.
To maintain the doctrine that lands can be invaded and a tract admittedly taken for the erection of a work to change the flow of waters, without subjecting the party so doing to the payment for all the lands thus taken, including such as are incidently destroyed, would appear to us to be shocking to every principle of law and justice.
Judgment will be entered for the plaintiff in the sum of $83,920, but before the judgment is certified the rule stated in Heyward v. United States (46 C. Cls., 484), as to the survey and conveyance of the lands taken, and possible correction of the judgment, will be followed.