(132 So. 2)

### FINNELL et al. v. PITTS.
#### 8 Div. 133.

Supreme Court of Alabama.
May 1, 1930.

Rehearing Granted Oct. 30, 1930.

Further Rehearing Denied Jan. 29, 1931.

Charlie C. McCall, Atty. Gen., and Eyster & Eyster, of Decatur, for appellants.

Julian Harris and A. J. Harris, both of Decatur, for appellee.

292

FOSTER, J.

The plaintiff owns, as the complaint shows, one hundred and eighty-five acres of farm land, and appellants, as highway commissioners of the state, are alleged to have built a state highway near it, and in doing so, a high embankment was constructed across a stream which drained a lake, and thereby diverted the waters from its natural flow, and caused them to flow upon and over plaintiff's land, submerging thirty acres, permanently injuring and destroying its value, and that the whole of the tract was depreciated in value, and that there has been no compensation paid him.

Appellants claim immunity as state officers, in the exercise of good faith, without negligence or want of engineering skill.

The complaint claims damages both for submerging and destroying the value of thirty acres out of the whole, and thereby and in addition thereto for depreciating the value of the whole.

The court gave to the jury the following written charge at the instance of plaintiff: "If you find for the plaintiff then the measure of plaintiff's recovery is the difference between the market value of the whole of his farm immediately before and after the injury proximately caused by the injury." Also in his general charge he instructed them that they were dealing with the whole tract of one hundred and eighty-five acres, and not alone with that flooded. Exception was taken to this. The court also in his rulings throughout, relating to the pleadings and his given charges and oral charge, tried the case on the theory that because the officers were acting as such, in an ordinary careful and skillful manner in good faith, for the state in the construction of its public works, that was no excuse for their conduct which caused such damage—that it was no excuse for the damage occasioned by submerging the thirty acres or for damage thereby to the balance of the farm and consequentially affected in value.

We find ourselves in agreement with the circuit court, in respect to the rulings indicated. Just compensation for taking property is not confined to payment for that which is taken. The compensation contemplated by section 23 of the Constitution extends to the damage to the tract of which that which is taken is a part, if there is such damage. This is not in the nature of consequential damage under section 235, which results from the construction or enlargement of works, highways, or improvements. Without the latter constitutional provision there was no remedy for consequential damages unless there was a taking. Under that provision, there is such a liability though there is no taking when the damage results consequentially from such improvements. But that section does not apply to the state. Duy v. Alabama Western Ry. Co., 175 Ala. 162, 57 So. 724, Ann. Cas. 1914C, 1119. So that the state is not due anything under that provision, and therefore owes nothing for consequential damages when there is no taking. But irrespective of section 235 the damage for a taking, which results to the whole tract, is due by the state, as well as by others, under section 23 of the Constitution. Hooper v. S. & M. R. R. Co., 69 Ala. 529; Jones v. N. O. & S. R. R. Co., 70 Ala. 232; City Council v. Townsend, 80 Ala. 489, 2 So. 155, 60 Am. Rep. 112; City Council of Montgomery v. Maddox, 89 Ala. 181, 7 So. 433; Duy v. Alabama Western Ry. Co., 175 Ala. 162, 57 So. 724, Ann. Cas. 1914C, 1119; Hamilton v. Ala. Power Co., 195 Ala. 438, 70 So. 737; U. S. v. Grizzard, 219 U. S. 180, 31 S. Ct. 162, 55 L. Ed. 165, 31 L. R. A. (N. S.) 1135; Campbell v. U. S., 266 U. S. 368, 45 S. Ct. 115, 69 L. Ed. 328; Sharp v. U. S., 191 U. S. 341, 24 S. Ct. 114, 48 L. Ed. 211; U. S. v. Archer, 241 U. S. 119, 36 S. Ct. 521, 60 L. Ed. 918.

We also think that this suit does not violate the constitutional prohibition against suing the state. For though the state cannot be sued (section 14, Constitution), its immunity from suit does not relieve the officers of the state from their responsibility for an illegal trespass or tort on the rights of an individual, even though they act pursuant to authority attempted to be conferred by the state. Elmore v. Fields, 153 Ala. 345, 45 So. 66; 25 R. C. L. 414; 36 Cyc. 917; Hopkins v. Clemson College, 221 U. S. 636, 31 S. Ct. 654, 55 L. Ed. 890, 35 L. R. A. (N. S.) 243. For when the state officers take private property though they apply it to a public use, a tort has been committed by them. Private property rights have been thereby unlawfully disturbed by them. We believe that the rule is universal that an agent is not excused from personal liability for a tort which he commits for and in the name of his principal, whether the principal is liable to suit or not.

The decisions of this court and the authorities generally apply that principle to

torts committed by state officers in the name of the state and on account of the state's public affairs. Elmore v. Fields, 153 Ala. 345, 45 So. 66; Hopkins v. Clemson College, supra. An individual cannot justify a tort on a contention that it is for the state, if the state had no such right. If the state had the right, then its officers, acting by its authority, were justified. The officers cannot be justified upon a mistaken notion of state authority. An inadvertent tort-feasor is such, though he may not be liable to the amount of damages as a willful tort-feasor would be. The question now being discussed is not the extent of liability, but the fact of liability vel non. If in the promotion of the state's business its officers without authority of law apply private property to the state's enterprises, they are guilty of the same nature of wrong, as if they were acting as agents of a private corporation. The wrong is that of the officers personally as well as that of their principal. The officers are sued, not because the state has committed a wrong, but because they personally, though acting as officers, have done so. When a person commits a tort, it is wholly immaterial upon the question of his liability, whether he was acting officially or personally.

■ The further important question, therefore, is whether the act of causing thirty acres of plaintiff's land to be submerged as a direct result of the highway construction, of which complaint is made, is a taking of private property for the state highway, or its application to such use for which just compensation is due under section 23 of the Constitution.

It appears that the claim is that plaintiff's land is made to catch and hold water occasioned by the construction of the highway. Drainage rights are specifically made subject to condemnation for this purpose. Acts of August 23, 1927, § 32 (Acts 1927, pp. 348, 358, 359).

What is the difference in this respect between covering land with water or with earth, thereby rendering it unfit for use by the owner? What effect on the question has its location, as respects its distance from the road, if the result is direct? There is no difference of opinion, but that water backed into a pond by a dam causes the land so flooded to be taken for the uses of the dam—a taking of such land, though far distant. The same is true though the water does not actually cover the land but makes it boggy and too wet for profitable use. This would be a direct result, and would be an application of the land thus affected to the use of the enterprise. This land is caused to hold water made to flow on it, just as land may be caused to hold earth cast upon it in the construction. The authorities fully sustain the view that submergence of the nature described in the com-

plaint and evidence in this case is a taking. U. S. v. Lynah, 188 U. S. 455, 23 S. Ct. 349, 47 L. Ed. 539; Pumpelly v. Green Bay & M. C. Co., 13 Wall. 166, 20 L. Ed. 557; Peabody v. U. S., 231 U. S. 530, 34 S. Ct. 159, 58 L. Ed. 351; U. S. v. Cress, 243 U. S. 316, 37 S. Ct. 380, 61 L. Ed. 746; Horstmann v. U. S., 257 U. S. 138, 42 S. Ct. 58, 66 L. Ed. 171; U. S. v. Grizzard, 219 U. S. 180, 31 S. Ct. 162, 55 L. Ed. 165, 31 L. R. A. (N. S.) 1135.

■■ It is also claimed that the overflow and submergence of the thirty acres could not have been foreseen or foretold, and therefore that the result is consequential and not direct. And it is argued that the appellants here took over the work after it was begun, and that to sustain this suit would be unjust to them. But we cannot agree with either conclusion, for they, as competent engineers, in taking over the uncompleted construction, could have rechecked the engineering work, and have discovered for themselves if the consequences of which complaint is here made would follow, and have made such additional surveys as were necessary to that end. They could know what the consequences would be the same as those who began the work. We see no justification in law for continuing the completion of a work whose effect was to take private property. The legal consequences are controlled by their individual connection with the work. Whether the Governor, contractor, employes, and others may be liable is beside the question. They may be, so far as this question is concerned, dependent upon their personal connection with the transaction. It is not for us to say or surmise why the consequences to plaintiff were not properly planned and cared for as well as the right of way. If the highway department constructs a road on one's land without a permit, and without paying just compensation, those who plan and construct the work are liable, and not exempt by reason of their official or contractual connection. The nature of such relation to the transaction is of no concern as affecting the principle of liability, provided there was such participation as to make one otherwise liable for the tort.

We find no reversible error in the record, and the rehearing is granted, the original opinion of the majority is withdrawn, and the foregoing is substituted for it.

Rehearing granted. Judgment of reversal set aside, and affirmed.

ANDERSON, C. J., and SAYRE and GARDNER, JJ., concur.

THOMAS, BOULDIN, and BROWN, JJ., dissent.

THOMAS, J. (dissenting).

The question is whether or not there is liability of highway officers who, in building a

public highway according to specifications approved by state and federal engineers, affected or diverted the flow of a stream, thereby raising the level of the lake that caused the damage by overflow upon lands of the plaintiff. Trial was had on several counts, of which count 5 will illustrate the question presented by the facts.

Appellee contends that such act and result were the taking of private property for public use with compensation, and that such taking was by the defendants as individuals; that section 23 of the Constitution forbade the defendants, the state, or any department thereof, acting as agents, servants, or officials, from constructing that highway as to cause plaintiff's alleged injury, and without just compensation being paid.

The contention of appellants is that the state may not be made a defendant in any court, law or equity, and that defendants' acts were those of the state. Section 14, Const.; Ex parte State, 52 Ala. 231, 23 Am. Rep. 567; Louisville & N. R. Co. v. Holmes, 206 Ala. 304, 89 So. 610; Louisville & N. R. Co. v. Shikle, 206 Ala. 494, 90 So. 900; Moon v. Hines, Director General of Railroads, 205 Ala. 355, 87 So. 603, 13 A. L. R. 1020.

In Moon v. Hines, etc., supra, it is stated generally (page 358 of 205 Ala., 87 So. 603, 605, 13 A. L. R. 1020).

"* * * It is an established principle of 'jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission.' Hill v. U. S., 9 How. 386, 13 L. Ed. 185; Beers v. Arkansas, 20 How. 527, 15 L. Ed. 991; U. S. v. Diekelman, 92 U. S. 520, 23 L. Ed. 742; Ball v. Halsell, 161 U. S. 72, 16 S. Ct. 554, 40 L. Ed. 622; Belknap v. Schild, 161 U. S. 10, 16 S. Ct. 443, 40 L. Ed. 599. The doctrine rests on reasons of public policy— the inconvenience and danger which would follow from a different rule. Belknap v. Schild, supra; 25 R. C. L. p. 412, § 49 et seq. * * *

"There is no distinction between suits against the government directly and suits against its property. Stanley v. Schwalby, 147 U. S. 508, 13 S. Ct. 418, 37 L. Ed. 259; Id., 162 U. S. 255, 16 S. Ct. 754, 40 L. Ed. 960; Belknap v. Schild, supra; Overholser v. Nat. Home for Disabled Volunteer Soldiers, 68 Ohio St. 236, 67 N. E. 487, 62 L. R. A. 936, 96 Am. St. Rep. 658."

And the text to 25 R. C. L. § 50, pp. 413, 414, based on the general authorities, is to the effect:

"The immunity of a state from suit is absolute and unqualified, and the constitutional provision securing it is not to be so construed as to place the state within the reach of the process of the court. Accordingly, suits

against officers of a state as representing the state in action and liability, where the state, although not a party to the record, is the real party against which relief is sought, and where a judgment for the plaintiff, although nominally against the defendant as an individual, could operate to control the action of the state or subject it to liability, are suits against the state. * * * The immunity of the State from suit does not relieve officers of the state from responsibility for illegal trespasses or torts on the rights of an individual, even though they act or assume to act under the authority and pursuant to the directions of the state; or where they unlawfully deprive a citizen of his property or prevent his free enjoyment of it."

This statement of the general rule is supported by many well-considered decisions by the Supreme Court of the United States, Florida, Tennessee, Kentucky, New York, Pennsylvania, Oklahoma, and Virginia. See, also, 36 Cyc. 915, 917, where an exception to this rule is stated, as:

"A suit against an individual who, claiming to act as a state officer, has committed or threatens to commit acts of wrong and injury to the rights and property of plaintiff, either without authority from the state or under color of or of an unconstitutional statute, brought to recover property wrongfully taken by defendant in behalf of the state, or for damages, or for an injunction, is not a suit against a state, for defendant, in assuming to act without lawful authority, lays aside his official character and becomes liable as an individual to persons injured by his unlawful acts; he is not sued as or because he is an officer of the state, but as an individual, and the court is not ousted of jurisdiction because he asserts authority as such officer; to make out his defense he must show that his authority was sufficient in law to protect him."

Its text as to the general rule is (36 Cyc. pp. 915, 916):

"Suits against officers of a state as representing the state in action and liability, and in which the state, although not a party to the record, is the real party against which relief is sought and in which a judgment for plaintiff, although nominally against defendant as an individual, could operate to control the action of the state or subject it to liability, are suits against the state. A broad line of demarcation separates such suits, in which it is sought to compel the performance, by affirmative official action on the part of defendants, of an obligation which belongs to the state in its political capacity, from suits against defendants personally on account of wrongs done or threatened to the personal or property rights of plaintiffs without authority or under color of authority unconstitutional and void. It seems that the rule which for-

bids a suit against state officers because in effect a suit against the state applies only where the interest of the state is through some contract or property right, and it is not enough that the state should have a mere interest in the vindication of its laws or in their enforcement as affecting the public at large or the rights of individuals or corporations; it must be an interest of value in a material sense to the state as a distinct entity."

The rule in this jurisdiction is thus announced or immunity from suits extended in Alabama Girls' Industrial School v. Reynolds, 143 Ala. 579, 580, 42 So. 114, where the bill for accounting was by the corporation against its treasurer who sought relief against it by way of cross-bill. The latter's effort was denied notwithstanding the fact of its incorporation and its express authorization for suit. It was held (headnotes 4 and 5):

."If a corporation is a mere State agency, a representative of the State instituted and maintained for the exercise of a governmental function, and any judgment or decree against it must be satisfied, if at all, out of property held by it, and this property belongs to the State, though the title is eo nomine in the corporation,—a suit against such corporation is in effect a suit against the State, and is prohibited by the Constitution.

"The constitutional provision, that the State should not be made a defendant in any suit at law or in equity, applies to a cross-bill as well as to an original bill, and prohibits the filing of a cross-bill to an original bill filed by the State."

In Alabama Industrial School v. Addler, 144 Ala. 555, 42 So. 116, 113 Am. St. Rep. 58, the suit was assumpsit to recover advance money paid by Addler & Company through their agent on a contract entered into in the name of said agent with the school, for the purchase from it of certain lands donated to it by Congress; held the school was within the constitutional prohibition against the state being made a party defendant to any suit. The case of Cox v. Board of Trustees of University of Alabama, 161 Ala. 639, 49 So. 814, 817, was a suit in ejectment by said trustees for the recovery of land belonging to the university. It was said of this character of public institutions, its property, and the rule as to actions by limitations, that:

"* * * The University of Alabama, by whatever corporate name or under the control of whatever agents it may be, is a part of the state; that it was founded by the state; that it is under the state control, and that the University is therefore a public municipal corporation; that as to its lands the state is and has always been the trustee; and that the board of trustees are mere agents of the state. Winston's Case, 5 Stew. & Port. 17; Bullock v. Governor, 2 Port. 484.

"It was decided by this court in the case of White v. Alabama Insane Hospital, 138 Ala. 479, 35 So. 454, that the hospital was a mere state agency created for the purpose of caring for and treating the unfortunate insane citizens of the state—purely a governmental function, wise and beneficial. It was also decided by this court in the case of Ala. Girls' Industrial School v. Reynolds, 143 Ala. 579, 42 So. 114, that this school, popularly known as 'Montevallo School,' is a mere agency of the state, and that all of its property is owned by the state, and that an action against it is substantially an action against the state. This case was affirmed, and, if possible, made stronger, by the decision of this court in the case of Alabama Industrial School v. Addler, 144 Ala. 555, 42 So. 116, 113 Am. St. Rep. 58. The cases above referred to settle the law in this state that public institutions created by the state purely for charitable or educational purposes are a part of the state, or a mere agency of the state; that the property of such corporations is really and in fact the property of the state, and that they are not subject to suit under section 14 of the Constitution of 1901."

In Creighton v. Air Nitrates Corporation, 208 Ala. 330, 94 So. 356, 358, the action was for work done and labor furnished in carrying out a governmental function, and contained the observation of the authorities aforediscussed, that "these institutions and their property belong to the state of Alabama; and an action against either is substantially an action against the state of Alabama."

We will defer for the present a decision as to pleading under section 14 of the Constitution and under the evidence, until important questions presented in arguments under sections 23 and 235 of the Constitution are disposed of. At the outset, the decisions make a distinction as to the field of operation for interdictions contained in the last-cited sections of the Constitution. The authority of section 23 is stated in Duy v. Alabama Western Railway Co., 175 Ala. 162, 173, 57 So. 724, 727, Ann. Cas. 1914C, 1119, as follows:

"As to the state itself, the sole restraint in the particular now important is Const. § 23, wherein it is provided that 'private property shall not be taken for, or applied to, public use, unless just compensation be first made therefor.' Section 235 is addressed to the restraint of 'municipal and other corporations and individuals invested with the privilege of taking property for public use.' This latter section does not apply to the state itself in the exercise of its sovereign power in restraint of which, in so far as we are now concerned, Const. § 23, alone operates."

And inferentially to the same effect is Meharg v. Alabama Power Co., 201 Ala. 555, 78 So. 909. It was under section 235, Const., that

our cases of City Council v. Townsend, 80 Ala. 489, 2 So. 155, 60 Am. Rep. 112, and City Council of Montgomery v. Maddox, 89 Ala. 181, 7 So. 433, allowed consequential damages. The provision for damages and injuries to property by one having the right of eminent domain did not exist until incorporated in the Constitution of 1875, § 7, art. 14; article 13, § 5, Const. 1867.

The effect of a class of our decisions as to "just compensation," where property was taken for construction of public roads, was recently reviewed in Rudder v. Limestone Co. (Ala. Sup.) 125 So. 670,[1] and Conecuh County v. Carter (Ala. Sup.) 126 So. 132.[2] It is apparent from the authorities (Duy v. Alabama Western Railway Co. and Meharg v. Alabama Power Co., supra) that we should now consider, not section 235 of the Constitution, providing for "municipal and other corporations and individuals invested with the privilege of taking property for public use," but the limitations placed upon the state by section 23, Const. It is therein declared that the right of eminent domain shall not be abridged, etc., *to prevent the Legislature* (1) from taking the property and franchises of corporations to subject them to public use in the same manner in which like properties of individuals are taken and subjected; (2) that private property "shall not be taken for, or applied to public use, unless just compensation be first made therefor"; nor shall private property be taken for private use, or for the use of corporations, other than municipal, without the consent of the owner; (4) provides for the passage of laws to secure to persons or corporations right of ways; (5) and for the passage of general laws for and to regulate the exercise of "rights herein reserved" by the Constitution, but that "just compensation shall, in all cases, be first made to the owner"; (6) and that the right of eminent domain shall not be so construed as to allow taxation or forced subscription for the benefit of "railroads or any other kind of corporations, other than municipal, or for the benefit of any individual or association."

It will be noted that section 23, Constitution, so far as concerns the state, requires just compensation for the *taking* of property and franchises for public use, as specified, unless just compensation be first made therefor, and does not extend to "inquiry," etc., as provided in section 235 of the Constitution; hence the proper distinction has been made between consequential damages (as under section 235) and the "taking" (as under section 23, Const.). And this distinction has been observed in applying like and applicable provisions of the Federal Constitution. In Bedford v. United States, 192 U. S. 217, 24 S. Ct. 238, 48 L. Ed. 414, Mr. Justice McKenna for that court held that:

"Injury from overflow and erosion to the lands of a riparian proprietor as the result of the action of the Mississippi river through a series of years is not such a direct consequence of the construction by the Federal government farther up the stream of a revetment along the banks, which did not change the course of the river as it then existed, but operated to prevent further changes, as to make such governmental action a taking of private property for public use within the meaning of the 5th Amendment to the Federal Constitution."

He illustrates the distinction and application as follows (192 U. S. 217, 24 S. Ct. 238, 240, 48 L. Ed. 417):

"The Constitution provides that private property shall not be taken without just compensation, but a distinction has been made between damage and taking, and that distinction must be observed in applying the constitutional provision. An excellent illustration is found in Gibson v. United States, 166 U. S. 269, 41 L. Ed. 996, 17 S. Ct. 578. The distinction is there instructively explained, and other cases need not be cited. It is, however, necessary to refer to United States v. Lynah, 188 U. S. 445, 47 L. Ed. 539, 23 S. Ct. 349, as it is especially relied upon by appellants. The facts are stated in the following excerpt from the opinion:

"'It appears from the 5th finding, as amended, that a large portion of the land flooded was, in its natural condition, between high-water mark and low-water mark, and was subject to overflow as the water passed from one stage to the other; that this natural overflow was stopped by an embankment, and in lieu thereof, by means of flood gates, the land was flooded and drained at the will of the owner. From this it is contended that the only result of the raising of the level of the river by the government works was to take away the possibility of drainage. But findings IX. and X. show that, both by seepage and percolation through the embankment and an actual flowing upon the plantation above the obstruction the water has been raised in the plantation about 18 inches; that it is impossible to remove this overflow of water, and, as a consequence, the property has become an irreclaimable bog, unfit for the purpose of rice culture or any other known agriculture, and deprived of all value. It is clear from these findings that what was a valuable rice plantation has been permanently flooded, wholly destroyed in value, and turned into an irreclaimable bog; and this as the necessary result of the work which the government has undertaken.'

"The question was asked: 'Does this amount to a taking?' To which it was replied: 'The case of Pumpelly v. Green Bay & M. Canal Co. 13 Wall. 166, 20 L. Ed. 557,

---

[1] 220 Ala. 485.    [2] 220 Ala. 668.

answers this question in the affirmative.' And further: 'The Green Bay Company, as authorized by statute, constructed a dam across Fox river, by means of which the land of Pumpelly was overflowed and rendered practically useless to him. There, as here, no proceedings had been taken to formally condemn the land.' In both cases, therefore, it was said that there was an actual invasion and appropriation of land as distinguished from consequential damage. In the case at bar the damage was strictly consequential. It was the result of the action of the river through a course of years. The case at bar, therefore, is distinguishable from the Lynah Case in the cause and manner of the injury. In the Lynah Case the works were constructed in the bed of the river, obstructed the natural flow of its water, and were held to have caused, as a direct consequence, the overflow of Lynah's plantation. In the case at bar the works were constructed along the banks of the river, and their effect was to resist erosion of the banks by the waters of the river. There was no other interference with natural conditions. Therefore, the damage to appellants' land, if it can be assigned to the works at all, was but an incidental consequence of them."

This case has been followed in that jurisdiction in Peabody v. United States, 231 U. S. 530, 34 S. Ct. 159, 160, 58 L. Ed. 351, 353, by Mr. Justice Hughes, who declares:

"* * * If the government had installed its battery, not simply as a means of defense in war, but with the purpose and effect of subordinating the strip of land between the battery and the sea to the right and privilege of the government to fire projectiles directly across it, for the purpose of practice or otherwise, whenever it saw fit, in time of peace, with the result of depriving the owner of its profitable use, the imposition of such a servitude would constitute an appropriation of property for which compensation should be made. The subjection of the land to the burden of governmental use in this manner might well be considered to be a 'taking' within the principle of the decisions (Pumpelly v. Green Bay & M. Canal Co., 13 Wall. 166, 177, 178, 20 L. Ed. 557, 560; United States v. Lynah, 188 U. S. 445, 469, 47 L. Ed. 539, 548, 23 S. Ct. 349; United States v. Welch, 217 U. S. 333, 339, 54 L. Ed. 787, 789, 28 L. R. A. (N. S.) 385, 30 S. Ct. 527, 19 Ann. Cas. 680), and not merely a consequential damage incident to a public undertaking, which must be borne without any right to compensation (Northern Transp. Co. v. Chicago, 99 U. S. 635, 642, 25 L. Ed. 336, 338; Gibson v. United States, 166 U. S. 269, 41 L. Ed. 996, 17 S. Ct. 578; Scranton v. Wheeler, 179 U. S. 141, 164, 45 L. Ed. 126, 137, 21 S. Ct. 48; Bedford v. United States, 192 U. S. 217, 224, 48 L. Ed. 414, 417, 24 S.

Ct. 238; Jackson v. United States, 230 U. S. 1, 23, 57 L. Ed. 1363, 1374, 33 S. Ct. 1011."

Likewise the subject is again adverted to in United States v. George F. Archer, 241 U. S. 119, 36 S. Ct. 521, 524, 60 L. Ed. 918, 921, 922, as follows:

"The court [47 Ct. Cl. 265], through Mr. Justice Barney, said:

" 'In the decision of this case it may be admitted that if the government had owned the site of the Leland dike at the time of its erection, or if it had been owned by a stranger to this suit, and hence had made no invasion upon the lands of the plaintiff, it would not have been liable for the destruction thereby inflicted, under the ruling in the Bedford Case, 192 U. S. 217, 48 L. Ed. 414, 24 S. Ct. 238.'

"But it was further said: 'Under the decisions of the Supreme Court in all cases of this character, it is the invasion upon the lands and the actual and visible possession which constitutes the taking, and when thus taken, all of the consequences incident to such invasion necessarily follow, among which is the liability to pay for the damage thereby occurring to the balance of the tract to which the land thus taken belongs.' Citing United States v. Grizzard, 219 U. S. 180, 55 L. Ed. 165, 31 L. R. A. (N. S.) 1135, 31 S. Ct. 162.

"Claimants concede the power of the government over the river, and that they 'do not base their claim upon any raising of the flood levels of the Mississippi river, although it is stated by them and was found as a fact by the lower court, that the high-water flood level of the Mississippi river had been raised 6 feet by the completion of the general levee system.'

"They 'recognize the fact that the right of the United States government to complete the levee system and maintain the same is indisputable, and that any purely incidental injury which might have resulted to them solely from raising the flood level would be a damnum absque injuria. They claim nothing by reason of said fact, adducing the same merely by way of inducement as showing that the ruin, which would inevitably have come to their plantation from the deflecting thereon of the flood waters by the construction of Leland dike, was merely accelerated and expedited, but not caused, by the raising of the flood level.

" 'Their claim is that the deposit of sand and gravel and the destruction of their lands thereby were a direct and immediate result of the construction of the dike which was built on their plantation, using a part of it for the base thereof and the material thereof, and constructing the same without any condemnation of their lands and ouster of

298

them therefrom, which, with the destruction, constituted the taking of their lands within the meaning of the 5th Amendment, and entitled them to compensation therefor.' * * *

"Great problems confronted the national and state governments; great and uncertain natural forces were to be subdued or controlled, great disasters were to be averted, great benefits acquired. There might be liability to the individual; if so, the liability should be clear, the cause of it direct and certain. This we explained in Jackson v. United States, 230 U. S. 1, 57 L. Ed. 1363, 33 S. Ct. 1011, and in Hughes v. United States, 230 U. S. 24, 57 L. Ed. 1374, 46 L. R. A. (N. S.) 624, 33 S. Ct. 1019. There is an effort in the present case to satisfy these conditions, but we do not think it goes far enough."

The result was a reversal of the judgment of the Court of Claims awarding damages, and remandment of the cause for more specific finding of fact.

This question was again considered in United States v. Cress, 243 U. S. 316, 37 S. Ct. 380, 383, 61 L. Ed. 749, 751; the authorities were reviewed, and under the right of eminent domain a taking by overflow caused in navigation improvement was defined. Mr. Justice Pitney observed that:

"Pumpelly v. Green Bay & M. Canal Co. 13 Wall. 166, 20 L. Ed. 557, involved the right to compensation for land overflowed with backwater from a dam erected and maintained in the Fox river, under authority of the state of Wisconsin, for the improvement of navigation. (A permissible exercise of state power, in the absence of action by Congress, although it was an interstate navigable water. Willson v. Black Bird Creek Marsh Co., 2 Pet. 245, 251, 7 L. Ed. 412, 414; Gilman v. Philadelphia, 3 Wall. 713, 18 L. Ed. 96.) The raising of the river above its natural stage, by means of an artificial structure, was the gravamen of the complaint. It was argued (page 174 [of 13 Wall., 20 L. Ed. 557]) that the state might, in the interest of the public, 'erect such works as may be deemed expedient for the purpose of improving the navigation and increasing the usefulness of a navigable river, without rendering itself liable to individuals owning land bordering on such river, for injuries to their lands resulting from their overflow by reason of such improvements.' This court over-ruled the contention, and held there was a taking without compensation, contrary to the applicable provision of the Constitution of Wisconsin.

"In United States v. Lynah, 188 U. S. 445, 47 L. Ed. 539, 23 S. Ct. 349, the same principle was applied in the case of an operation by the government of the United States. For the improvement of the navigation of the Savannah river certain dams and other obstructions were placed and maintained in its bed, with the result of raising the water above its natural height and backing it up against plaintiff's embankment upon the river and interfering with the drainage of their plantation. This was held (pages 465, 471, [of 188 U. S., 23 S. Ct. 349, 47 L. Ed. 539]) to be a taking of private property, requiring compensation under the 5th Amendment, notwithstanding the work was done by the government in improving the navigation of a navigable river. The raising of the water above its natural level was held to be an invasion of the private property thereby flowed. * * *

"It follows from what we have said that the servitude of privately-owned lands forming the banks and bed of a stream to the interests of navigation is a natural servitude, confined to such streams as, in their ordinary and natural condition, are navigable in fact, and confined to the natural condition of the stream. * * *

"But the authority to make such improvements is only a branch of the power to regulate interstate and foreign commerce, and, as already stated, this power, like others, must be exercised, when private property is taken, in subordination to the 5th Amendment. Monongahela Nav. Co. v. United States, 148 U. S. 312, 336, 37 L. Ed. 463, 471, 13 S. Ct. 622; United States v. Lynah, 188 U. S. 445, 465, 471, 47 L. Ed. 539, 546, 549, 23 S. Ct. 349. And we deem it clear that so much of the properties of the respective defendants in error as was unaffected by the flow of the rivers or their tributaries prior to the construction of the locks and dams in question was private property, and not subject to be overflowed, without compensation, in the raising of the level of the rivers by means of artificial dams."

This distinction was made at the outset in cases where there was direct invasion of the lands of a claimant whose damages were allowed; and damages have been denied where that result was "altogether consequential"; for example, where the "injury or destruction" was by the agency or act and purposes as provided for by our section 235 of the Constitution and made to apply to "municipal and other corporations and individuals invested with the privilege of taking property for public use," etc., and not to the state as in section 23, Const. Mr. Justice Pitney said of the class where consequential damages were the subject of controversy (United States v. Cress, 243 U. S. 316, 37 S. Ct. 380, 384, 61 L. Ed. 752):

"These cases have no proper relation to cases such as Gibson v. United States, 166 U. S. 269, 41 L. Ed. 996, 17 S. Ct. 578, where no water was thrown back on claimant's land, and the damage was confined to an interfer-

ence with the access thence to the navigable portion of the river; Scranton v. Wheeler, 179 U. S. 141, 153, 45 L. Ed. 126, 133, 21 S. Ct. 48, which likewise had to do with the interruption of access from riparian land to a navigable channel; Bedford v. United States, 192 U. S. 217, 225, 48 L. Ed. 414, 417, 24 S. Ct. 238, where the damage to claimant's land resulted from operation conducted by the government 6 miles farther up the river; Jackson v. United States, 230 U. S. 1, 23, 57 L. Ed. 1363, 1374, 33 S. Ct. 1011, where owners of lands on the east bank of the Mississippi claimed compensation as for a taking of their property by reason of the effect of levees built on the west bank opposite their lands as a part of a system of levees designed to prevent crevasses, retain the water in the river, and thus improve the navigation."

The subject was again discussed in John Horstmann Co. v. United States, 257 U. S. 138, 42 S. Ct. 58, 66 L. Ed. 171, wherein Mr. Justice McKenna held for the court as follows:

"An allegation, in the petition in a suit in the court of claims to recover from the United States the value of property charged to have been destroyed by raising the level of a lake through a government irrigation project, that, owing to the porous condition of the soil in the irrigation canals and ditches and 'the lack of proper lining in the said canals and ditches, and owing to the way said canals and ditches were built and to the natural condition existing,' the water flowed into the lake and seeped and percolated through the canals and ditches, cannot be said to base the claim upon tort, so as to defeat the jurisdiction of the court of claims, but must be regarded as intended to forestall any defense based on the character of the works, that from them there could be no causal connection between the government project and rise of the lake level,—especially where the court of claims explicitly finds that there was no negligence. * * *

"The destruction of the property of the owner of a lake through the raising of the lake level, consequent upon the carrying out of a government irrigation project, cannot be said to be a taking, from which an agreement by the United States to make compensation will be implied, where the result of the government work to the lake owner's property could not have been foreseen or foretold. * * *

"In other words, what is done may be in the exercise of a right, and the consequences only incidental, incurring no liability. Bedford v. United States, 192 U. S. 217, 48 L. Ed. 414, 24 S. Ct. 238; Kansas v. Colorado, 206 U. S. 46, 51 L. Ed. 956, 27 S. Ct. 655; Tempel v. United States [248 U. S. 121, 39 S. Ct. 56, 63 L. Ed. 162], supra. And there is character-

ization of the Lynah Case in United States v. Cress, 243 U. S. 316, 61 L. Ed. 746, 37 S. Ct. 380.

"We think the cases at bar are within the latter decisions, and it would border on the extreme to say that the government intended a taking by that which no human knowledge could even predict. Any other conclusion would deter from useful enterprises on account of a dread of incurring unforeseen and immeasurable liability."

In this jurisdiction, it may be said that the taking of property within the meaning of the constitutional provisions without just compensation need not amount to a total dispossession of the owner from any physical object of the class subject to the right of eminent domain; yet if it is such that its effect is "to invade his property rights," this amounts to the taking of such property subject to eminent domain within the use of these words employed in the Constitution. 18 L. R. A. 166, note; Vanderlip v. City of Grand Rapids, 73 Mich. 522, 41 N. W. 677, 3 L. R. A. 247, 16 Am. St. Rep. 597, where the grade of a street was raised; and our Maddox and Townsend Cases, supra, where the grades of streets were lowered, affecting ingress and egress.

And in Memphis & Charleston Railroad Co. v. Birmingham, Sheffield & Tennessee River Railway Co., 96 Ala. 571, 11 So. 642, 643, 18 L. R. A. 166, where the railroad tracks were crossed by those of another public service corporation, it is observed of such a taking:

"There is abundant authority in the textbooks and adjudicated cases for the proposition that the crossing or intersecting of the road of one railway company by that of another is the taking of property, within the meaning of constitutional provisions requiring compensation to be made. That to constitute a taking of property it is not necessary there should have been an actual disseisin of the owner, but that it is a 'taking' to invade his property by superinduced additions of water, sand, earth, or other material, or by having any artificial structure placed upon it so as effectually to destroy or impair its usefulness. 6 Amer. & Eng. Enc. of Law, p. 542. And in the case of Pumpelly v. Green Bay Co., 13 Wall. 166 [20 L. Ed. 557], it is said that a serious interruption to the common and necessary use of property may amount to a taking, within the meaning of constitutional provisions, and entitle the owner to compensation. In the case of Chicago & A. R. R. Co. v. Springfield & N. W. R. R. Co., 67 Ill. 147, it was held, in a case of the construction of one railroad across the track of another, that the company whose track is crossed is entitled to recover, not only just compensation for the land taken, but also for such incidental loss, inconvenience, and damage as might reasonably be expected to result

from the construction and use of the crossing in a legal and proper manner. The same principle is recognized in the following cases: Peoria & P. U. R. R. Co. v. Peoria & F. R. Co., 10 Amer. & Eng. R. Cas. 129; Lake Shore & M. S. R. Co. v. Cincinnati, S. & C. R. R. Co., 30 Ohio St. 604.".

See, also, Mobile & Birmingham R. R. Co. v. Louisville & Nashville R. R. Co.; 192 Ala. 136, 68 So. 905. In Louisville & Nashville R. R. Co. v. Western Union Tel. Co., 195 Ala. 124, 71 So. 118, Ann. Cas. 1917B, 696, the controversy arose over the expiration of contract rights of the two corporations, and occupation thereof as to portions of the railroad's right of way by the telegraph company.

The instant embankment or way of the public highway, without a culvert, was within and across the bed of Beaver Lake or its natural drainage way, with the result of diverting the waters therefrom and from its immediate flow and meander to the Tennessee river to and under the culvert for drainage of Swan Lake. This was with the result of raising the latter's water course above its usual and natural level or height, and backing it upon plaintiff's lands, destroying the system of tile drainage on the lands made the subject of this litigation. Was this within the definition of a "taking" as construed by our state and federal cases (United States v. Cress, 243 U. S. 316, 37 S. Ct. 380, 61 L. Ed. 746, 752; United States v. Lynah, 188 U. S. 445, 23 S. Ct. 349, 47 L. Ed. 539; Memphis & C. R. Co. v. B'ham, S. & Tenn. R. Ry. Co., 96 Ala. 571, 11 So. 642, 18 L. R. A. 166; Mobile & B. R. R. Co. v. L. & N. R. R. Co., 192 Ala. 136, 68 So. 905); and under the sections of our State Constitution (sections 23 and 235, Const.)? In answering this, the question recurs to section 14 of the Constitution and whether the instant suit was against the state.

It is necessary to an answer that consideration be given to the statute creating the highway commission and essential features of the highway Code. Acts 1927, p. 348, § 1397 et seq., Code of 1928.

The state highway department, as created, consists of a state highway commission of three, one member designated as the highway director and two associates; their qualifications being in substance as follows (Acts 1927, pp. 349, 350, 351, et seq.):

Section 5. Each commissioner is required to give bond.

Section 6. The duties and powers of the commission are to designate, construct, etc.; to make contracts, etc.

Section 9. The state highway commissioner, Finnell, is required to give his entire time to the duties of his office.

Section 10 (a). Finnell had charge of all engineering problems, and of all construction of roads, and is required to devote his time thereto. He is sued in this case for doing what the law required of him.

Section 11. Commissioners are paid salaries by the state.

Section 12. Commission is required to keep official records.

Section 16. The general duties of highway department are outlined:

"The State Highway Commission shall determine the character and have the general supervision over the construction and maintenance of all the public roads, bridges, and culverts in the State where the funds of the State are used, and shall have a general supervision over the expenditure of any funds apportioned to any county of the State for the construction and maintenance of all public roads, bridges and culverts in each county." (Acts 1927, p. 353.)

It is further provided (Acts 1927, p. 353, § 18; p. 355, § 21; p. 358, §§ 30, 31, 32; p. 359, § 33; p. 360, § 38):

Section 18. "The proceeds of the sale of State Road Bonds and the moneys appropriated by Congress under the Act known as the Federal Aid Law, shall be used exclusively for the purpose of constructing highways and bridges and the acquisition of bridges and of material." And this was a federal aid highway at the point in question.

Section 21. No member of the commission shall be interested in any contract or sale of material.

Section 30. Contracts are made in the name of the state of Alabama, approved by the state highway department, highway director, and the Governor—as was done in this case.

Sections 31 and 32. The county is required to procure the right of way without cost to the state, etc.; or the state may, as provided, acquire such right by purchase or condemnation, etc.

Section 33. Contracts are let only after the right of way has been obtained by the county and approved by the Governor.

Section 38. The state assents to the Federal Aid Law (39 Stat. 355), and its contracts are let in relation thereto, and: "The State Highway Department is hereby authorized to enter into all contracts and agreements with the United States and the provisions of said act of Congress and all amendments thereto, to submit such schemes or programs of construction and maintenance as may be required by the Secretary of Agriculture, and to do all other things necessary to fully carry out the cooperation contemplated and provided for by said Act of Congress and all Amendments thereto."

"All contracts" for federal aid projects are "subject to the approval of the Secretary of

Agriculture." 23 USCA § 13. The secretary is authorized to prescribe rules and regulations for the carrying out of the Federal Highway Act. 23 USCA § 19.

Under the general law, all contractors with the United States for the construction of any public work are required to enter into bond, with an additional provision to make prompt payment for labor and material entering into the work. 40 USCA § 270; Union Indemnity Co. v. State for Use of McQueen-Smith, etc., Co., 217 Ala. 35, 114 So. 415. And it is declared by section 181, Acts 1927, p. 397, a felony for any highway commissioner to be interested in contracts made by the state. The far-reaching provisions of this section are:

"Any member of the State Highway Commission, or any other person in the employ of the state highway department, who shall be, either directly or indirectly interested in any contract of agreement for the construction or maintenance of any road or bridge in this state, or the sale of any machinery, material, or anything whatever entering into the construction, repair or maintenance of the roads and bridges in this state, shall be guilty of a felony and upon conviction thereof shall be sentenced to imprisonment in the penitentiary for not less than two nor more than ten years."

And this statute further provided (section 202): Bonds issued for the purpose of securing funds to construct, improve, and maintain roads, highways, and bridges; and section 209 provided that funds therefrom are to be used exclusively for the construction, improvement, and maintenance of the roads, etc.

The foregoing numerals used beside the sections quoted are employed in the Acts of 1927 rather than the Code of 1928.

There is no question but that the state had power to create a state highway commission, as held in White v. Alabama Insane Hospital, 138 Ala. 479, 482, 35 So. 454:

"In reference to public highways, it has several times been said by this court, the commissioner's court, acting for and exercising all the power of the county, exercises a quasi legislative authority, not to be guided by evidence produced according to legal rule, but controlled rather by its knowledge of the geography of the country, the wants, wishes and ability of the people."

Such is the rule since the decision in Askew v. Hale County, 54 Ala. 639, 25 Am. Rep. 730, as to mere governmental auxiliaries or agencies.

The highway commissioners were engaged in public corporate and governmental functions, and were fully authorized in this respect and the completion of the construction project of their predecessors in office under the statute. Birmingham v. Whitworth, 218

Ala. 603, 119 So. 841; Hillman v. Anniston, 214 Ala. 520, 108 So. 539, 46 A. L. R. 89; Bessemer v. Barnett, 212 Ala. 202, 102 So. 23; Williams v. City of Birmingham, 219 Ala. 19, 121 So. 14; City of Tuscaloosa v. Fitts, 209 Ala. 635, 96 So. 771.

It was recently declared in the Mississippi court as to liability of a board of levee commissioners (National Surety Co. v. Miller, 124 So. 251, 253, 254), as follows:

"* * * When we create boards and commissions and invest them with high duties and powers towards the accomplishment of great public objects, if we are to subject them to actionable liability for errors of decision and judgment and cast their estates in ruin, although they acted within their jurisdiction and in good faith, we will have only insolvents in office, or else those who will be so fearful of disaster to their private fortunes and the safety of their families that the rule of their conduct will be that of nonaction or of action so feeble and halting and cautious, their performances so paralytic of the vigor of decision, that they would become little more than objects of commiseration and at last of contempt.

"The whole matter has been summed up by the Supreme Court of the United States in an opinion by Justice Field, in Bradley v. Fisher, 13 Wall. 335, 20 L. Ed. 651, with language so apt and comprehensive that the case has become the leading expression on the point, and the quotation now made from that opinion has been accepted in practically every jurisdiction as the settled law on the subject:

"'A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject-matter is invested by law in the judge, or in the court which he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgments may depend. Thus, if a probate court, invested only with authority over wills and the settlement of estates of deceased persons, should proceed to try parties for public offenses, jurisdiction over the subject of offenses being entirely wanting in the court, and this being necessarily known to its judge, his commission would afford no protection to him in the exercise of the usurped authority. But if on the other hand a judge of a criminal court,

invested with general criminal jurisdiction over offenses committed within a certain district, should hold a particular act to be a public offense, which is not by the law made an offense, and proceed to the arrest and trial of a party charged with such act, or should sentence a party convicted to a greater punishment than that authorized by the law upon its proper construction, no personal liability to civil action for such acts would attach to the judge, although those acts would be in excess of his jurisdiction, or of the jurisdiction of the court held by him, for these are particulars for his judicial consideration, whenever his general jurisdiction over the subject-matter is invoked. Indeed some of the most difficult and embarrassing questions which a judicial officer is called upon to consider and determine relate to his jurisdiction, or that of the court held by him, or the manner in which the jurisdiction shall be exercised. And the same principle of exemption from liability which obtains for errors committed in the ordinary prosecution of a suit where there is jurisdiction of both subject and person, applies in cases of this kind, and for the same reasons.'

"So in the case at bar. The levee board had jurisdiction over the subject-matter. It was within the general scope of their jurisdiction to build the levees, or to repair or to reconstruct them and to do all things needful to the accomplishment of that object."

The evidence shows that this construction was of a state and federal aid road, determined upon and begun by the defendants' predecessors in office who had done 65 per cent. of the work; and defendants merely proceeded with the same as they were required by law to do.

In the leading case of Elmore v. Fields, 153 Ala. 345, 45 So. 66, 127 Am. St. Rep. 31, there was shown a failure of action within the line and scope of duty of Warden Fields, and that his commission of the tort or trespass was in the cutting of trees by the individual who happened to be in that office. There was no statute compelling him, as an official, to cut the trees, etc., as the warden of the state penitentiary.

In Comer v. Bankhead, 70 Ala. 493, 498, Judge Stone said of the contract for hire of convicts:

"The consideration proceeds from the State, and the promise of Comer to pay hires enures to the State. The money, when paid by him, is the property of the State. If Comer were to violate his contract, any suit for its breach would be in the name of the State. Bass, in negotiating the contract, did not transcend his authority, at least, for one year. He did what the law constituted him an agent to do; and when his act received the ratification and sanction of the Governor, it became a contract; not the contract of himself, but of the State, whose authority he had for making it, and which authority he did not transcend, to the extent of one year's hiring, at least. It would be a novel doctrine, if we were to hold that an agent, disclosing his principal, contracting in the principal's name, and within the scope of authority conferred on the agent, failed to bind his principal, or imposed any liability on himself. In such case, the agent is the mere instrument of the principal—is dwarfed out of sight; and the contract is that of the principal, and may be declared on as made by him. 'Qui facit per alium facit per se.' "

Having indicated that under the law and the undisputed facts the court below was without capacity to entertain a suit against the defendants acting for the state and within the line of their duties, and under the requirements of law, the several defendants are within the inhibition and protection of the Constitution. Section 14, Const.; Alabama Industrial School v. Addler, 144 Ala. 555, 42 So. 116, 113 Am. St. Rep. 58.

Thus, it is unnecessary to rest the decision on the question of whether there was a taking vel non of private property for a public use without first making the just compensation required by the State and Federal Constitutions.

There was much relevant evidence offered by defendants, showing their necessary and required official acts under the law were denied by the trial court. However, on the whole evidence before us, the affirmative instructions requested by the respective defendants should have been given.

And as to this, it should be further stated that it is uncontroverted that Woolsey Finnell was the Alabama highway director, a civil engineer of experience; that he had not prepared the plans for building F. A. P. No. 157, but that they were prepared by former commission, and the contract was let before he went into office, February 1, 1927; that the proposals and contract for this project are part of the files of his official office. The defendants introduced the contract for the construction of this federal aid project No. 157, and which contract is made between the state of Alabama, acting through its highway engineer, W. A. McCalla, and the contractors, McWhorter and Gilbert. The contract bears the approval as of date June 25, 1926, of Wm. W. Brandon, Governor of Alabama, W. A. McCalla, state highway engineer, John A. Rogers, president of the state highway commission, Landon G. Smith, commissioner of construction, and R. P. Boyd, commissioner of maintenance. The proposals for this project are then set out, and the bond made by the contractor with the state of Alabama for the faithful performance of the contract, etc.

This project was paid for, one-half by the state of Alabama, and one-half by the United States government. Finnell's connection with the project after his induction into office was the mere matter of going over the work and inspecting it. Mr. Turner and Mr. Law were never on the project. Mr. Burnum was the division engineer in charge. There was error in refusing affirmative instructions requested by defendants.

Swan Lake does not extend to said highway; a slough extends thereto from east of the highway: borrow pits are erected along the highway and on each side of F. A. P. No. 157, and they are built at such elevation that the water runs from Swan Lake in a northwesterly direction back to Beaver Lake slough.

The plans and contract had been made and let before Finnell went into office. He did not eliminate, or cause to be eliminated, any culverts; only acted in carrying out the state's part of the contract with the contractors according to the plans and specifications, and in the performance of these duties, he, from time to time, issued instructions to his division engineer. Finnell did not put money into the project, nor pay any of the expenses. He worked for the people, and the project was paid for by the state of Alabama; he only did such work as an agent or representative of the state of Alabama was required by law to do, and the construction work was 65 to 70 per cent. complete at the time he went into office of the chief state highway officer. In his opinion (as an expert in such matters) the plans were correct and satisfactory and were carried out as originally made by the former commission and engineer. The contract having been in force when Finnell and others went into office, it was his duty, and he earnestly endeavored, to carry out the contract of the former commission and requests of the superior agents and plans of the federal government.

The evidence shows that the state of Alabama acquired a right of way through this country of some three to four hundred feet in width; that over to the west, the embankment of the Southern and Louisville & Nashville Railroads extended across Beaver Lake slough, was some 10 or 12 feet high, and measured about 16 feet wide across the top. Under the Southern Railway there was a six by four storm culvert, and the opening under the Louisville & Nashville Railroad is through a thirty-inch pipe, and that this was true for some fifteen years before the construction of the instant highway embankment; and water was turned by both of these embankments back into Swan Lake when there was such a volume of water that it could not pass through the culverts or openings. The water from Beaver Lake traveled about 1,000 feet along the eastern side of the embankment of F. A. P. 157, to the Swan Lake bridge; then from Swan Lake there was a series of borrow pits constructed so as to carry water back to Beaver Lake slough. In the opinion of the engineers and experts, there was not sufficient additional water carried into Swan Lake to cause it to overflow or damage the property of Pitts, as claimed.

No part of Pitts' land was taken or applied to this road or highway in its construction; Pitts' lands were located about a mile and a half south of F. A. P. 157. It is further shown that all engineering work was done in a skillful way. Burnum, the division engineer, caused no work to be done except that provided for in the contract, plans, and specifications; and so of the contractors, they did only such work as was provided in the contract.

The state was acting by and through defendants, and they were acting within their duties exacted by law, and were therefore immune from civil action. Kittler v. Kelsch, State's Attorney, etc., 56 N. D. 227, 216 N. W. 898, 56 A. L. R. 1217. See, also, Yaselli v. Goff (C. C. A.) 12 F.(2d) 396, 56 A. L. R. 1239.

In National Surety Co. v. Miller (Miss.) 124 So. 251, it was held members of a "levy board," if acting in good faith, are protected from consequences of erroneous decisions on matters within their general jurisdiction.

See, also, the cases of Williams v. City of Birmingham, 219 Ala. 19, 121 So. 14, and City of Tuscaloosa v. Fitts, 209 Ala. 635, 96 So.. 771, where it was held the city engaged in governmental function was not liable for tort.

If the right of action lies against these defendants, the plaintiff could have well sued the individuals, who happened to be the respective Governors of this state—Brandon or Graves—and who approved the contracts, or Mr. Wells, the chief engineer in charge for the United States, and the Secretary of Agriculture of the United States approving the plans and specifications under which the contract work was done. Extreme illustration sometimes is an approved test.

The evidence further shows that before and since the construction of F. A. P. No. 157, when there is an abnormal amount of water, the water flows from Beaver Lake into Swan Lake; thus the natural course of water, during such abnormal seasons or conditions, was from Beaver Lake to Swan Lake.

Had McEntire's ditch been kept open and unobstructed, a greater volume of water from Swan Lake would have been carried to the river; and in the adverse ruling of the trial court, in not allowing defendants to fully show as to this and the nature and expense reasonably required by that ditch or drain, there was likewise error.

The embankment was two miles from plaintiff's property. The waters of Beaver Lake slough were not thrown onto plaintiff's property; under plaintiff's theory, they were diverted into Swan Lake, a larger body of water, two miles long; this Lake, it is claimed, rose and overflowed its banks. Swan Lake, however, was not in its natural condition. A dam had been built across the lower or western end; how much this increased the water therein is not told by the evidence; it formerly had an outlet to the west, and this was dammed, evidently for the purpose of impounding the waters, or permitted to become choked and had contributed to that effect.

Beaver Lake slough was a small stream, a ditch four by four feet being sufficient to carry it at all times, except high water; and during high water, the natural overflow and drainage was into Swan Lake. Under the evidence, at all times Beaver Lake had a natural drainage towards Swan Lake; but when the waters were low, a small stream known as Beaver Lake slough carried the water off in another direction. Even then, it was possible and frequently occurred that a lot of this water did return to Beaver Lake along the borrow pits at the Southern and Louisville & Nashville Railroads. That is to say, that in high water, Beaver Lake slough connected with and the natural drainage of its water was into Swan Lake; in low water Beaver Lake slough pursued a meandering course to the northwest to the Southern and Louisville & Nashville Railroads, prior to the public highway construction. After that construction, this meandering stream emptied into Swan Lake at a point a couple of miles from plaintiff's property (under the evidence of defendants' witnesses) by way of a system of borrow pits on the west side of the embankment that carried the water or an equivalent amount back to its original meandering course.

This construction shows that no overflow of Swan Lake or damage to plaintiff's property was or could have been foreseen or foretold at the time of the construction, and this being true, there can be no recovery (see Horstmann Co. v. United States, 257 U. S. 138, 42 S. Ct. 58, 66 L. Ed. 172), and the damages, if any, to plaintiff's property were consequential.

I am further of opinion there was error in refusing defendants' charges that we denominate A and B set out on page 104 of the record, and requested by defendants Finnell, Turner, Law, and Burnum, and refused by the court. And on this phase of the case, the writer is of opinion there should be a reversal, though it be held the suit is not against the state and against the individuals who exercised the functions indicated in count 5, and though it be held they are liable for the tort declared upon and for which damages are sought.

The complaint seeks consequential damages for subsequent results and not for an actual taking in the first place by defendants. It is averred:

"The defendants, Finnell, Law and Turner, as members of the State Highway Commission of Alabama, and the defendants, Burnum and Kilgore, as engineers employed by said commission, have for some time and throughout the year 1927 been engaged in supervising and directing, and the defendants, McWhorter and Gilbert, as contractors employed by the State Highway Commission, having during said time been engaged in constructing a public highway in Limestone County, Alabama, known as the Bee Line Highway, and in the construction of said highway, a high embankment was constructed or thrown across a slough or stream which drained a lake in said county, known as Beaver Lake, away from and beyond plaintiff's said land, but said embankment across said slough diverted the waters drained from said Beaver Lake from its natural course and into Swan Lake, and as a proximate consequence thereof Swan Lake was caused to flow over and upon said land of the plaintiff, submerging thirty acres, or more, of said land, permanently injuring and destroying the value thereof, together with the surrounding land of said tract, which has become soaked and soggy, and the whole of said tract of land of the plaintiff has greatly depreciated in value to his damage as aforesaid. And plaintiff avers that the said embankment was so constructed without his consent, and without prepayment to him of compensation for the taking of and injury to his said land."

This, I take it, is not a charge of such a taking or injury to property as is covered by section 23 of the Constitution of Alabama, or the Fifth Amendment to the Constitution of the United States.

In Alabama Power Co. v. Carden, 189 Ala. 384, 66 So. 596, there were condemnation proceedings for the right to flood lands. Several important questions were settled in this jurisdiction as to the value of lands so taken: (1) Compensation for the value of the land taken at the time of condemnation; (2) for diminished value after that time of his other property legally related to that taken, because of the taking; (3) where lands taken for impounding water by dam is only periodically submerged and so that the owner may use the property to advantage at other times —the measure of compensation for such occasionally flooded area being "the value of that area before and after condemnation." Alabama Power Co. v. Keystone Lime Co., 191 Ala. 58, 67 So. 833, Ann. Cas. 1917C, 878; Alabama Power Co. v. Carden, 189 Ala. 384, 66 So. 596; Dancy v. Alabama Power Co., 198 Ala. 504, 73 So. 901; Alabama Central Ry. Co. v. Musgrove, 169 Ala. 424, 53 So. 1009;

Dean v. County Board of Education, 210 Ala. 256, 97 So. 741. That is to say, in short, the measure of damages for flooding land is the depreciation in the value of the land. 20 C. J. 758, § 214.

With this view of damages that may have been assessed on timely and due condemnation, let us examine some recent decisions as to damages sought and declined of recovery by this court.

In Meharg v. Ala. Power Co., 201 Ala. 555, 78 So. 909, 910, the complaint alleges a condition as to backwater caused by the dam in question that extended to within three-quarters of a mile to plaintiff's residence and that did not submerge any of his land; and the complaint was for consequential damages that proximately resulted from the condition alleged to have been caused or permitted by defendant. The opinion declares of the pleading that:

"The complaint does not charge such a taking or injury to property as is covered by section 23 of the Constitution. Nor does it show a right to recover for injuries resulting thereto as covered by section 235 of the Constitution. The injuries complained of did not exist, nor could the damages therefor be ascertained upon the construction of the dam, but arose subsequent thereto and as the result of the maintenance of same in conjunction with subsequent intervening causes. In other words, the injuries complained of were not capable of being ascertained at the time the dam was constructed, or even so reasonably contemplated as to authorize payment or security therefor as provided by said section 235 at the time of the construction or enlargement of the ways, works, etc. See opinion upon the rehearing in the case of Hamilton v. Alabama Power Co., supra [195 Ala. 438, 70 So. 737], and authorities there cited."

The case of Hamilton v. Alabama Power Co., 195 Ala. 438, 440, 442, 449, 70 So. 737, 738, was for injunction against prosecution of "suits for damages to land," and in some of the suits negligence was averred, and some for "injuries to the plaintiffs' property," and some "for injuries to the person." The court said:

"* * * If the injuries complained of do exist, and the complainant has been guilty of negligence which proximately caused same, the complainant would be liable although the law authorized the construction and maintenance of the dam. If, however, the complainant has not been guilty of negligence, it is not liable as for the erection or maintenance of a nuisance, for the reason that the thing done was authorized by law, except perhaps for injuries to the plaintiffs' property—as will be hereinafter discussed. * * *

"In the case of Dallas County v. Dillard, 156 Ala. 354, 47 So. 135, 18 L. R. A. (N. S.) 884, this court held, following the case of Chester County v. Brower, 117 Pa. 647, 12 A. 577, 2 Am. St. Rep. 713, that the foregoing section [§ 23 of the Const.] authorized the recovery for consequential damages, in an action on the case, for injuries done another's property by virtue of the construction or enlargement of the ways and works, notwithstanding there was no actual taking of the property and that said section was primarily intended to prevent an exemption from consequential damages when private property was injured without an actual taking. Of course, the condemnation proceeding may have included all damages done to the owner's remaining land, or that would arise from the construction of the works in question; but this would not relieve the complainant from being amenable for injuries as for a diminution in the value of the lands owned by persons who were not parties to the condemnation proceedings. * * *

"As has been repeatedly stated, by this court, section 235 of our Constitution was borrowed from Pennsylvania, and in placing it in our Constitution of 1875, and readopting it in the Constitution of 1901, we did so in view of the construction that had been given it by the Supreme Court of the state from which it was taken. This section has often been construed by the Pennsylvania court, and the court said: 'It is very plain to our view that the constitutional provision was only intended to apply to such injuries as are capable of being ascertained at the time the works are being constructed or enlarged, for the reason, among others, that it requires payment to be made therefor, or security to be given, in advance. This is only possible where the injury is the result of the construction or enlargement, for how can injuries which flow only from the future operation of the road, and which may never happen, be ascertained in advance, and compensation made therefor?' "

In Jones v. Jefferson County, 206 Ala. 13, 14, 89 So. 174, 175, the gravamen of the complaint was the operation of a sewerage plant whereby a large volume of sewerage was "collected on the banks of Valley creek," from which foul and poisonous substances were discharged into the creek, polluting its waters, etc., "and producing an intolerable *stench upon and adjoining lands of plaintiffs,* interfering with or preventing their cultivation and their use for stock or for human habitation." It was said of such taking or consequential damages:

"But in the case of Meharg v. Ala. Power Co., 201 Ala. 555, 78 So. 909, it was held that consequential damage resulting from the maintenance or operation of an authorized

dam is not within the scope of section 23, or section 235, of the Constitution. That ruling is a clear negation of any right of action here under those constitutional provisions."

And in Pearson v. Central of Georgia Ry. Co., 215 Ala. 239, 242, 110 So. 5, 7, it was declared of damages that might arise in the future from railroad building and in the construction of a fill on the right of way that:

"Such damages to lands not taken are not sufficiently direct and certain to be recoverable in this proceeding. This rule was stated in Kan. & Tex. Ry. v. N. W. Coal & Mining Co., 161 Mo. 288 and 325, 61 S. W. 684, 693, 51 L. R. A. 936, 84 Am. St. Rep. 717, as follows:

" 'Courts must deal in cases like this with the conditions that exist at the time condemnation is asked, and cannot take into account conditions that may or may not arise or be created thereafter.' "

The whole complaint is to be considered in the determination of whether it states a cause of action, as well as the allegations made "which tend to discharge the defendant as those which tend to charge him." Meharg v. Alabama Power Co., 201 Ala. 556, 7S So. 909, 910. In that case some of the counts charged a negligent failure to clear the ground.

It would appear from the authorities that there was error in not sustaining demurrer to count 5, and like counts, on the authority of and in the language of Burnett v. Ala. Power Co., 199 Ala. 360, 74 So. 459, 467, as it "shows authority" for construction done and does not "charge that the water was negligently backed so as to submerge" plaintiff's lands and obstruct his drainage system.

There is analogy to be found in Aycock v. City of Decatur, 219 Ala. 486, 122 So. 664, 667, saying:

"The purpose of the pleader in framing count 5 was to state a cause of action without alleging negligence. The reliance for a finding of error is upon the fact that water was diverted from its natural flow and concentrated at a certain place whence it overflowed the curb and upon plaintiff's property. * * * In Arndt v. Cullman [132 Ala. 540, 31 So. 478, 90 Am. St. Rep. 922] it seems to have been held that a municipal corporation is liable in damages, where it so changes the grade of a street as to prevent the natural flow of surface water from the street and diverts it onto plaintiff's property, and in Avondale v. McFarland, 101 Ala. 381, 13 So. 504, in view of constitutional provisions, it was held that to so change the grade of a street as to prevent the natural flow of water away from the adjacent property rendered the municipality liable. * * * The court is of opinion that, since the municipality has no control over the ordinary flow of surface water, its concentra- tion at the place from which it is alleged to have overflowed upon plaintiff, unless brought about by negligence on the part of the municipality in providing for its flow in an artificial channel, would not impose liability, and, therefore, that the demurrer was properly sustained. 43 Corpus Juris, 1143."

And for like reason there was error in the failure to overrule demurrer to plea No. 6 as amended, alleging the work was done pursuant to authority of law of the state in the construction of a federal aid highway according to plans, specifications, and instructions of the Secretary of Agriculture of the United States, and that said construction was made with care and skill; and to plea 7 as further amended in like words with the addition that defendants "did not exceed their jurisdiction and authority." And so as to the ruling on amended pleas 9 and 10. The amendment thereto after demurrer was first sustained was:

"The construction of the State Highway— Bee Line Highway known as Federal Aid Project No. 157, the deft., Woolsey Finnell, was Highway Director and Law & Turner Associate Highway Commissioners, and the three constituted the Highway Commission of State of Alabama after Feby. 1927 and not before. H. D. Burnum was after March 15, 1927, a Division Engineer of the State of Alabama, and McWhorter & Gilbert contractors, a contract having before the encumbrance of Finnell, Law, Turner and Burnum having been awarded said contractor for Project 157 by the Highway Commission in 1926 by State of Ala. by Highway Commission of Ala.

"That all work on said highway was by the State of Alabama as aided by the U. S. Government and by its authority and direction and the construction of said Highway of the State of Alabama was aided by U. S. Gov., and not otherwise, and that the only connection of defts,—Finnell, Turner, Law & Burnum was as such officers of the State of Alabama as aforesaid after they came into office and not otherwise, McWhorter and Gilbert as such contractors aforesaid—

"That the acts of defts., as such officers aforesaid and as contractors were acts done in the proper exercise of Governmental powers and that said Highway constructions were built in a skillful and careful manner and way—and according to plans & specifications made therefor by the State of Ala.—as aided by U. S. Gov., and prepared before the respective tenures of office of the respective defts., and that said Project 157 was inspected & approved by H. C. Wells, Asst., Engineer Bureau of Roads, United States."

For these rulings on the pleadings there was reversible error.

Plea 8 as amended adopts plea 6 and avers that if said plaintiff has a valid claim, it is

against the county of Limestone, state of Alabama, and not against the defendants. The demurrer was properly sustained as to said plea, in that it did not aver that the damages claimed and resulted were upon the right of way for such highway that was by law required to be secured, or that it was procured by that county. And proof tending to show or affording the inference that no such damages as plaintiff claims could have been foreseen or foretold by skillful engineers should have been allowed. Horstmann Co. v. United States, 257 U. S. 138, 42 S. Ct. 58, 66 L. Ed. 172, from which decision we have quoted above as to what amounted to "a taking" of private property within the Fifth Amendment to the Constitution of the United States or section 23 or section 235 of the Constitution of Alabama.

Therefore the court erred in not allowing the witness Finnell as an expert to answer the questions: "If you, in your judgment as a civil engineer, consider that the highway at this particular point was constructed regularly, or with care or thought, or what manner?" "I will ask you if it was constructed as it—as the best engineering practice would call for that project with reference to a culvert or elimination of a culvert?" "Whether or not highways (are) constructed with reference to ordinary conditions applicable to water force, or whether or not anticipation is made for unusual water flow?" And "do you consider that a culvert should have been placed there between Beaver Lake and Swan Lake," affecting the "stretch of road there" referred to and under consideration? These questions should have been permitted and answered.

The foregoing is the opinion of the writer and believed to be pertinent. I am in accord with the views hereinafter expressed as to the remedy that may be employed by mandamus.

BOULDIN, J. (dissenting from the holding of the majority opinion).

To my mind such serious consequences attend the majority decision as to call for an expression of views which impel me to dissent.

In recent years the state of Alabama has entered upon the construction and maintenance of public highways through the state highway department, a state agency recognized by Constitution and statute. It is further recognized by federal laws, and a program of co-operative construction by the two governments has proceeded for many years.

It is a vast complicated constructive enterprise of business character. No one questions the power of the highway department to bind the state by contracts approved by the Governor, and in case of federal projects approved also by the federal highway authorities.

Necessarily plans and specifications, includ-

ing drains and bridges, are a part of all such contracts, state contracts. It must follow that the plans and specifications are state plans, government made and government approved. When a contract is let to construct a road as per such plans and specifications, the rights of the builder under contract with the sovereign state become involved.

Now, the majority opinion holds in effect that the members of the highway commission are insurers against any subjection of lands to public use, although located far away from the roadway, unless condemnation proceedings are first had and compensation paid before the taking.

Note the opinion proceeds on the hypothesis that the lands are taken for public use under the power of eminent domain, which is to say they are taken by the state, become the property of the state for the uses to which they are devoted. How can they be acquired by the state unless the officers taking them are acting for the state? Again the opinion recognizes that recovery is for the just compensation due the owner because of such taking for the state's use. So the state, through its judicial department, is saying to its officers, you shall pay for lands taken by the state for the state.

The complaint rests on no want of engineering skill or negligence.

The opinion declares as matter of law an unqualified duty to foresee and forestall any flooding of lands, not only by those who make the survey, plans, and specifications, but declares a like duty on all plans already approved by the state and federal governments and in course of construction.

That the performance of official duty is presumed until the contrary appears has heretofore been regarded a maxim in the law; but it seems such rule, under the majority opinion, affords no protection to officers charged with the duty of executing contracts made by predecessors in office, contracts conforming in all respects with the requirements of law and approved by the highest executive authority.

It seems the principle here announced is that any officer or agent of the state, or any one acting under him, who takes private property for the use of the state, or imposes a servitude thereon for like use, and while the state holds the property and is daily using it for public purposes, is personally liable for the just compensation due the owner. All this, because the proper authority did not in the first instance condemn the property and make compensation before the taking.

In my humble judgment such view imposes upon officers, contractors, bondsmen, and even employees, the obligation of insurers, a risk of such far-reaching consequences that we may expect it to be reflected in the cost of such undertakings, an outlay of public funds

because of such contingencies far exceeding the just compensation which is due and should be paid for private property devoted to public use under conditions shown in this case.

When we write that the state through its agencies has taken this property and devoted it to the uses of the state, and still holds it for such use, we should write that the obligation to pay for it is a state obligation.

Now it seems all the hardship and injustice above noted must be visited on officials and others because the landowner is entitled under the Constitution to just compensation, and the state is not subject to suit.

Because the state is not subject to suit does not mean the citizen is without remedy to enforce obligations of the state. Daily, hundreds of state obligations or debts are incurred by its multiform agencies payable from public funds devoted to that purpose. Nowhere has the officer having the duty to ascertain and pay the same been held personally liable for the debt; but mandamus to require the performance of duty enjoined by law is widely recognized.

Accepting the view that this is a taking of private property for public use, that the state has taken it, and the state holds it, then the obligation to pay for it is a state obligation—an obligation payable from state highway funds.

For all that appears, the taking of this land for drainage purposes may be less expensive than cutting in a bridge in the midst of a lake and on a high fill. In any event, when the present authorities were informed that a servitude of this kind was cast upon plaintiff's land, it was their duty to either remedy it by installing a proper drain, or to retain it as property devoted to the state's use, and, in the latter event, to pay the reasonable compensation therefor by agreement with the owner, or failing to so agree, proceed to ascertain the same by condemnation proceedings. I see no reason why mandamus would not lie to require the highway commission to proceed thus to ascertain and pay the just compensation due the landowner.

I would be understood as expressing no views on other questions discussed by my associates, preferring to limit my opinion solely to what is above written.

BROWN, J. (dissenting).

That the permanent flooding of land by the erection or construction of artificial obstructions in a natural water course amounts to a taking of the land within constitutional provisions that private property shall not be taken for public use, without just compensation, is sustained by reason and the great weight of authority. United States v. Cress; United States v. Kelly et als., 243 U. S. 316, 37 S. Ct. 380, 61 L. Ed. 746; Thurston v. City of St. Joseph, 51 Mo. 510, 11 Am. St. Rep. 463; 1 L. R. A. 298, note; Barron v. City of Memphis, 113 Tenn. 89, 80 S. W. 832, 106 Am. St. Rep. 810, and authorities cited in note page 814; 10 R. C. L. 70, § 61.

Under the facts of this case, the taking, however, was by the state through its duly constituted officers, intrusted with the duty and authority to carry into effect the state's enterprise of constructing public highways, and the fact that the state cannot be sued is the only fact that renders the decision of the case difficult.

By the act of taking through its constituted authorities in the furtherance of the state's scheme of internal improvements, the state has impliedly promised to make just compensation, because the dictates of justice and the provisions of section 23 of the Constitution so require. U. S. v. Kelly et al., supra; United States v. Great Falls Mfg. Co., 112 U. S. 645, 5 S. Ct. 306, 28 L. Ed. 846; United States v. Lynah, 188 U. S. 445, 23 S. Ct. 349, 47 L. Ed. 539.

To state the proposition otherwise, the state of Alabama by the act of taking is liable ex contractu to compensate the owner to the extent of the injury.

And the state by the issuance of its bonds has provided the money, and by statute has prescribed the procedure to ascertain and determine the amount of compensation to be paid in such cases. Acts 1927, pp. 348, 359, § 32.

And in the absence of any other remedy, mandamus is an appropriate remedy to compel the assessment (2 C. J. 1159, and authorities cited under note 79) and the payment of such damages (State Board of Administration et al. v. Roquemore, 218 Ala. 120, 117 So. 757).

There is an absence of averment in the complaint showing that the defendants have been guilty of negligence or wrongdoing, and the facts averred negative the conclusion that they have taken the plaintiff's property for their own use, and on no principle of law can they be made liable. Zeigler v. South & North Ala. R. R. Co., 58 Ala. 594.