Bobby Darryl Roden appeals from a summary judgment in favor of Marshall County, *Page 607 
the Marshall County Commission, Marshall County Commission Chairman J. Charles Wright, and Bill McGriff. We affirm.
On August 6, 1986, Bobby Roden purchased a tract of real estate in a residential area near Albertville, Alabama, from Sage Ventures, Inc. ("Sage"). The property, which was adjacent to the Hustleville Baptist Church and to the Fairview Cemetery, was apparently a parcel of a 90-acre tract that Sage had purchased for division and resale. Although Roden's deed contained no restrictions on property use, such restrictions — specifically, a restriction against poultry farming on the premises — were discussed, the defendants say, in prepurchase negotiations between Roden and Bill McGriff, who was employed by Sage for "property management and consulting."
In March or April 1989, Roden contacted Gold Kist, Inc., to determine whether Gold Kist would assist him in establishing a poultry farm. More specifically, Roden proposed to erect two chicken houses on the premises and asked whether Gold Kist would stock the houses with broiler chickens. Gold Kist preliminarily expressed an interest in the project and dispatched Randall Vickery, a Gold Kist "broiler serviceman," to inspect the Roden property. During the visit, Vickery asked Roden whether he anticipated neighborhood opposition to the project and Roden replied that he expected none.
When instructed by a potential lender that financing was contingent upon a "letter of intent" from Gold Kist, Roden requested and received from Gold Kist a letter dated May 18, 1989, stating its "intent" to stock two chicken houses on Roden's property "when completed to Gold Kist specifications," subject to Gold Kist's receipt of "loan approval from [a] lending institution." Roden submitted this letter, along with income projections supplied by Gold Kist, to SouthTrust Bank.
While these negotiations and transactions were proceeding, opposition to the project was mounting in the neighborhood. In particular, Bill McGriff received numerous telephone calls inquiring about restrictions to which Roden's property might be subject. McGriff, after reviewing a copy of a deed from Sage to another purchaser in the area, dictated the following memorandum:
"To whom it may concern:
 "The lots and land owned by Sage Ventures, Inc. in Fairview Estates and surrounding the Fairview Cemetery adjacent to the Hustleville Baptist Church were all sold with the knowledge of the following restrictions:
 "1. Said property shall be used for residential purposes only and the above described property shall have only one residential dwelling with appurtenant out buildings.
 "2. Said property shall not have situated thereon any trailers or mobile homes or any type construction that is mobile in design or construction.
 "3. Said premises shall not be used for raising of poultry or hogs."
This memorandum was presented to Roden on approximately May 20, 1989, by three community members, including Thomas Jordan, who owned land adjacent to Roden's. They also presented him with two petitions — one containing the signatures of 18 members of the Hustleville Baptist Church, and the other containing the signatures of 68 community members. The petitions stated:
 "We, the undersigned property owners of the Cochran Corner and Old Fairview Church area, are opposed to the construction of any poultry houses in this particular area.
 "Due to the fact that his area is so congested and thickly populated with nice homes and a church, we feel any construction of this type will be detrimental to the health and well-being of the citizens of this community in which we live."
In a further effort to interdict the project, Jordan visited Charles Wright, chairman of the Marshall County Commission, and inquired whether the "county commission could do anything."Deposition of Charles Wright, at 21. Wright replied that the county commission had no "rights or jurisdiction, as far as that was concerned," but that he "would bring [the community's concerns to Gold Kist's] attention if that is what the community wanted." Id. Jordan then asked: "Will *Page 608 
you take this petition and let's get in contact with Gold Kist and turn this over to them?" Wright acceded to the request and sent Gold Kist the following letter, written on official stationery:
 "I'm writing you this letter concerning the wishes of the people of the Cochran Corner and Fairview Church Community. This area is in the Police Jurisdiction and is located four miles North of Albertville off State Highway # 75.
 "It has been brought to our attention that Mr. Bobby Darryl Roden has applied, through Gold Kist, to construct a poultry house in this most densely populated area.
 "We, the property owners, are sending you a copy of the petition . . . which all property owners have signed opposing construction of this nature. This petition, not only includes the property owners, but also includes a group of people who attend the Hustleville Baptist Church.
 "Also, I'm sending you a copy of the statement from Mr. Bill McGriff, an accountant that was in charge of the Sage Ventures, Inc. in Fairview Estates. . . .
 "This petition will be brought to the attention of the Marshall County Commission at their next regular County Commission Meeting.
 "In closing, we the property owners . . . are very supportive of the poultry operations in our county and surrounding areas. Yet, we feel this type of operation in this congested area should not be."
(Emphasis added.)
Harold Chitwood, to whom the letter was addressed, was an executive vice-president for Gold Kist. After receiving this packet of material in his office in Atlanta, Georgia, Chitwood telephoned Dean Strickland, who was the "field operations supervisor for Gold Kist operations in Boaz," Alabama,Brief of Appellees Wright, Marshall County, and the MarshallCounty Commission, at 12, and "discussed" the letter that he had received from Wright. Strickland replied that he had already learned of opposition to the project and had decided not to provide the chickens.
The next day, Stickland, his supervisor John Bekkers, and Vickery visited Roden at Roden's home regarding these developments. The intentions of the parties during and following that meeting are hotly disputed. However, reviewing the evidence "in the light most favorable to [Roden,] the nonmovant," as we are required to do on review of a summary judgment, Stephens v. City of Montgomery, 575 So.2d 1095, 1097
(Ala. 1991), we construe the discussion and its purpose as no more than an attempt by the officials to discourage Roden from pursuing the project — not, as the defendants contend, as essentially a notification of Gold Kist's decision to withdraw its letter of intent.[1]
Between the date of meeting with Roden and June 2, 1989, Strickland received in the mail from Chitwood Wright's letter, accompanied by the petitions. On June 2, Strickland personally visited Bob Terrell, SouthTrust Bank's officer in charge of Roden's loan application. At that time, Strickland told Terrell, in substance, that, because of opposition to the project, Gold Kist had decided not to honor its letter of intent.[2]
On December 12, 1989, Roden filed a three-count complaint against Marshall County, the Marshall County Commission, Marshall County Commission Chairman Charles Wright (hereinafter referred to collectively as "the Marshall County defendants"), and Bill McGriff in the United States District Court for the Northern District of Alabama. Count one alleged that in writing to Gold Kist, "Charles Wright, . . . acting as the agent of [the] defendant, Marshall County Commission, and of [the] defendant, Marshall County," had unlawfully interfered with the plaintiff's "Constitutional right to freedom *Page 609 
of contract . . . and to pursue a . . . business opportunity." (Emphasis added.) Consequently, he alleged, these defendants had "deprived [him] of the rights, privileges and immunities secured . . . by the Fourteenth Amendment to the United States Constitution."[3] (Emphasis added.) Counts two and three stated claims against Wright and McGriff based on state law grounds. More specifically, count two alleged that Wright and McGriff had unlawfully interfered with a business relationship and count three alleged that McGriff had falsely disparaged Roden's real estate title.
On February 14, 1991, Wright moved for a summary judgment on the issue of his individual liability under § 1983, on the ground, inter alia, that he was entitled to qualified immunity. The trial court denied the motion, and Wright appealed. The Court of Appeals for the Eleventh Circuit reversed. In an unpublished opinion, that court stated:
 "It does not violate any clearly established constitutional principle for a politician, in response to a request by his constituents who had signed petitions and under the circumstances here, to write a letter to Gold Kist, Inc. encouraging the latter not to enter into an arrangement to place chicken houses on the plaintiff's property.
 "Accordingly, the judgment of the district court is reversed and the case is remanded to the district court with instructions to grant defendant Wright's motion for summary judgment based upon qualified immunity, and for further proceedings not inconsistent with this opinion."
Roden v. Wright, 948 F.2d 1297 (11th Cir. 1991) (table of cases without published opinions, 948 F.2d 1297). Subsequently, the district court entered a judgment in favor of Marshall County, the Marshall County Commission, and Charles Wright on Roden's federal claims, and dismissed the state law claims against the Marshall County defendants and McGriff without prejudice.
On January 17, 1992, Roden filed a three-count complaint in the Marshall County Circuit Court against the same defendants. Count one alleged that in writing to Gold Kist "Charles Wright individually, and in his official capacity, . . . acting as the agent, servant or employee of . . . Marshall County Commission and Marshall County, [had] intentionally [and unlawfully] interfered with the business relationship between [Roden] and Gold Kist." Count two stated similar claims against Wright and McGriff in their individual capacities. Count three alleged that McGriff had falsely disparaged Roden's real estate title.
On February 14, 1992, the trial court dismissed the claims on the ground that they were barred by the statute of limitations. This Court reversed, explaining that, pursuant to 28 U.S.C. § 1367(d), the running of the limitations period applicable to Roden's claims was tolled during the pendency of his federal action. Roden v. Wright, 611 So.2d 333 (Ala. 1992).
On January 29, 1993, and February 25, 1993, the Marshall County defendants and McGriff, respectively, moved for summary judgments. On April 21, 1993, the trial court entered a summary judgment in favor of all defendants. Roden appealed. We shall discuss in separate sections the issues dispositive of the claims against the Marshall County defendants and those dispositive of the claims against McGriff.
 I. The Marshall County Defendants
Wright contends that his correspondence with Gold Kist constituted a discretionary act within the scope of hisofficial authority. Consequently, he contends, pursuant toRestatement (Second) of Torts § 895D, "Public Officers" (1974), which this Court adopted in DeStafney v. University of Alabama,413 So.2d 391, 393 (Ala. 1981), he is entitled to qualified or "good faith" immunity from all claims against him in his individual capacity. Furthermore, he contends, the Court of Appeals for the Eleventh Circuit, in holding that he was entitled to qualified immunity from liability on the federal claims, necessarily resolved these factual issues in his favor, and, therefore, that Roden is estopped to relitigate them in a collateral action *Page 610 
such as this one. We agree with this latter contention.
The Alabama doctrine of collateral estoppel precludes relitigation of an issue identical to one that was litigated by the identical parties in a prior action, in which the issue was"actually litigated" and in which a resolution of that issue was necessary to the judgment. Dairyland Insurance Co. v.Jackson, 566 So.2d 723, 726 (Ala. 1990) (emphasis added). This action and the one prosecuted by Roden pursuant to § 1983 obviously involve identical parties. Additionally, a comparison of the legal and factual questions involved in this action with those involved in Roden's § 1983 action reveals a factual issue that is common to both actions, that is, whether Wright'sdecision to correspond with Gold Kist was a discretionary acttaken within the scope of his authority. Also, a consideration of the analytical procedure developed in the Eleventh Circuit to determine the availability of qualified immunity compels the conclusion that the issue was actually resolved in favor of Wright and that the resolution of that issue was necessary to that court's judgment.
For example, in deciding whether a public official is entitled to qualified immunity in actions brought pursuant to § 1983, the Eleventh Circuit employs the following two-step analysis:
 "1. The defendant public official must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'
 "2. Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions 'violated clearly established constitutional law.' Zeigler [v. Jackson], 716 F.2d [847] at 849 [11th Cir. 1983]. Accord, I.A. Durbin, Inc. v. Jefferson National Bank, 793 F.2d 1541, 1550 (11th Cir. 1986), Flinn v. Gordon, 775 F.2d 1551, 1553 (11th Cir. 1985)."
Rich v. Dollar, 841 F.2d 1558, 1563-64 (11th Cir. 1988); see also Sims v. Metropolitan Dade County, 972 F.2d 1230, 1236
(11th Cir. 1992); Hudgins v. City of Ashburn, 890 F.2d 396 (11th Cir. 1989).
Thus, in stating that "[i]t does not violate any clearly established constitutional principle for a politician . . . to write a letter to Gold Kist, Inc. encouraging the latter not to enter into an arrangement to place chicken houses on the plaintiff's property," and in directing the district court to "grant defendant Wright's motion for summary judgment based upon qualified immunity," the Court of Appeals for the Eleventh Circuit indicated that it had proceeded to the second step of its two-step analysis. Because the characterization of the act as discretionary or ministerial is comprehended in the first
step of the court's procedure, the court must first have affirmatively resolved the issue whether Wright's decision to write Gold Kist was within his discretionary authority — thus shifting the burden to Roden to produce evidence of bad faith — before proceeding to the second step of its inquiry. Indeed, it may be taken as a general rule that qualified immunity "is available only to officials performing discretionary
functions." Harlow v. Fitzgerald, 457 U.S. 800, 816,102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (emphasis added).
Determining whether Wright is entitled to good-faith immunity from liability under Roden's state-law claims requires resolution of the same issue involved in step one of the Eleventh Circuit's analysis. This is true because § 895 D of the Restatement provides:
 "(3) A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if
 "(a) he is immune because engaged in the exercise of a discretionary function. . . ."
Id. (Emphasis added.) Here, therefore, as in the federal court, the availability of good-faith immunity turns on whether Wright's correspondence involved a discretionary act taken with the scope of his authority. Because this issue was squarely presented to, and was necessarily decided by, the Court of Appeals for the Eleventh Circuit, the doctrine *Page 611 
of collateral estoppel bars its relitigation in this Court.
Additionally, Roden presented no evidence of bad faith, and he has not argued in this Court that Wright acted in bad faith. Consequently, we hold that Wright is entitled to immunity from the claims against him, in his individual capacity, alleging interference with a business relationship.
This holding also disposes of the claims against the other Marshall County defendants, because the same policy considerations that support the application ofindividual-capacity immunity in cases such as this one support the application of official-capacity immunity.[4] In other words, if Wright is immune in his individual capacity, the other Marshall County defendants, whose liability is based on the doctrine of respondeat superior, are similarly entitled to immunity. Gore v. City of Hoover, 559 So.2d 163, 165 (Ala. 1990) (where the basis of liability is respondeat superior, "if the agent is not liable, the principal cannot be liable, either") (applying the principle stated in United Steelworkers ofAmerica v. O'Neal, 437 So.2d 101 (Ala. 1983), and Larry TerryContractors, Inc. v. Bogle, 404 So.2d 613 (Ala. 1981)). Thus, we conclude that the trial court properly entered the summary judgment in favor of the Marshall County defendants.
 II. Defendant McGriff A. Slander of Title
Roden contends that the trial court improperly entered the summary judgment in favor of McGriff on count three of his complaint. In order to overcome McGriff's properly supported summary judgment motion, however, Roden must present "substantial evidence" creating a genuine issue of material fact. Ala. Code 1975, § 12-21-12(d); Ala.R.Civ.P. 56. InMerchants National Bank of Mobile v. Steiner, 404 So.2d 14, 21
(Ala. 1981), this Court set out the following elements of slander of title to realty:
 "(1) Ownership of the property by plaintiff; (2) falsity of the words published; (3) malice of defendant in publishing the false statements; (4) publication to some person other than the owner; (5) the publication must be in disparagement of plaintiff's property or the title [thereto]; and (6) that special damages were the proximate result of such publication (setting them out in detail)."
Assuming, arguendo, that the statements in McGriff's memorandum were legally "false," we note that Roden, nevertheless, presented no substantial evidence to rebut McGriff's prima facie showing that he acted without malice in publishing the statements.
Malice does not equate with negligence. Alabama Power Co. v.Laney, 428 So.2d 21 (Ala. 1983). Malice requires "proof that [the defendant] intentionally disparaged [the] plaintiff's title to the property slandered or recklessly disparaged [it]without information sufficient to support a bona fide belief" in the veracity of the disparaging statement. Harrison v.Mitchell, 391 So.2d 1038, 1041 (Ala.Civ.App. 1980) (emphasis added). In other words, "if the defendant had probable cause for believing the statement, there can in law be no malice."Steiner, 404 So.2d at 21 (emphasis added).
In this case, McGriff testified that Sage's policy was to include in all its deeds prohibitions against poultry farming on the premises, and that the absence of such a restriction in Roden's deed was an inexplicable error. This testimony is amply corroborated by the record, which includes three deeds from Sage to other purchasers. Those deeds were executed before the Roden deed, and all contained restrictions precisely as they appear in the McGriff memorandum. In fact, one of those deeds is a "correction deed," which Sage executed after discovering that the original deed did not contain the restrictions. *Page 612 
Additionally, McGriff testified that he and Roden discussed chicken-house restrictions in their prepurchase negotiations. More specifically, McGriff testified:
 "A. I remember talking to [Roden] about horses being allowed on the property because the first piece of property we sold in any of the McConnell property was to Billy Miller and he specifically asked that horses be allowed on the property. And then we excluded everything else that we listed in the deeds — no chicken houses, no poultry houses, only one residence per tract, and no mobile homes — that kind of thing.
 "Q. [By Roden's attorney] And you recall a specific statement by you to Mr. Roden about chicken houses?
 "A. Well, I told him about all the restrictions that we had in the subdivision. And in fact, we drove down to the subdivision that afternoon as I recall.
". . . .
 "Q. Did you tell Mr. Roden that this particular piece of property would be restricted as far as chicken houses is concerned?
 "A. Yes. And, as I remember, what he told me was that that was certainly not a problem because he had had all the chicken houses he had cared about having."
This evidence, in conjunction with other testimony of a similar nature, compels the conclusion that McGriff did not "recklessly" disparage Roden's title "without information sufficient to support a bona fide belief" in the veracity of the statements in his memorandum. Harrison, 391 So.2d at 1041. Thus, although he may have exercised less than ordinary care in publishing the memorandum without looking specifically atRoden's deed, this evidence of his omission did not, under the circumstances, constitute the evidence of recklessness necessary to support an inference of malice, and, consequently, did not create a genuine issue of material fact on the issue of malice. Because McGriff made a prima facie showing that there was no malice, and because Roden did not rebut that showing with substantial evidence, the summary judgment for McGriff was proper as to the claim alleging slander of title.
Even more compelling, however, is an alternative argument advanced by McGriff in support of the summary judgment in his favor. That ground, which applies equally to both claims against McGriff, is discussed in the following section.
 B. Interference With a Business Relationship
McGriff contends that Roden failed to demonstrate a causal relationship between his memorandum and Gold Kist's termination of the business relationship. Therefore, he insists, the summary judgment, which was entered in his favor on this ground, was proper. We agree with this contention.
Viewing the evidence most strongly in favor of Roden, we must conclude that the final decision to terminate the relationship was first evidenced by Strickland's visit with Bob Terrell at SouthTrust Bank. That visit immediately followed Strickland's receipt of the materials from Chitwood. However, Strickland testified unequivocally that the first time he saw a copy ofMcGriff's memorandum was a few days before November 5, 1990, when Strickland was deposed in the case. Thus, although the evidence implies that Strickland may have been influenced by the letter from Wright and by the petitions, it also implies that McGriff's memorandum was either inadvertently omitted from the packet from Chitwood or otherwise escaped Strickland's notice. Moreover, Bekkers, Strickland's supervisor, testified that Bekkers made the ultimate decision regarding the relationship, that he never saw McGriff's memorandum, and that "Chitwood had no input into" his decision. Additionally, Chitwood, who did see the memorandum, testified that he did not attempt to persuade Strickland or Bekkers to terminate the relationship, because, he said, when he first telephoned Strickland about the matter, Strickland assured him that the decision had already been made. We are thus compelled to conclude that the summary judgment was properly entered on Roden's claims against McGriff.
For the foregoing reasons, the judgment of the trial court is affirmed as to all the defendants.
AFFIRMED. *Page 613 
HORNSBY, C.J., and MADDOX, SHORES, HOUSTON and STEAGALL, JJ., concur.
[1] The defendants construe the remarks of the company officials as promising to supply only one batch of chickens, that is a token commitment to the letter of the agreement.
[2] Also, in a letter dated that same day, Chitwood replied to Wright in the following manner:
 "It is my understanding that Mr. Roden no longer intends to construct a poultry house in the area you described. I should point out that Gold Kist actually has no control over how individuals use their land. However, Gold Kist itself has no intentions of placing chickens in a house for Mr. Roden in the area you describe."
[3] The action was brought pursuant to 42 U.S.C. § 1983.
[4] Restatement (Second) of Torts § 895D, comment b, explains the rationale supporting qualified immunity as follows:
 "It has traditionally been explained by the courts that public officers and employees would be unduly hampered, deterred and intimidated in the discharge of their duties, and as a result undesirable shackles would be imposed upon agencies of government, if those who act improperly or even exceed the authority given them were not protected in some reasonable degree by being relieved from private liability."
Id. (emphasis added).