[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 58 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 59 
Reginald Lightfoot, a student at Alabama A M University, appeals from a summary judgment for Dr. David Henson, president of Alabama A M University; David Smith, chief of the Department of Public Safety of Alabama A M; and Jim Floyd, an investigator for the Department, in Lightfoot's action alleging conversion, false imprisonment, defamation, slander of title, and negligence. The action arises from an incident on the campus of Alabama A M in which $2158 cash and a Ford Mustang automobile were seized from Mr. Lightfoot and retained for several months by Investigator Floyd.
On March 18, 1992, the Alabama A M Department of Public Safety received an anonymous telephone call in which the department dispatcher was told that a drug sale was taking place on campus behind Grayson Hall dormitory. The dispatcher relayed the information to Chief Smith, who instructed the dispatcher to send officers to investigate. The dispatcher telephoned Captain Charles Porter, and, in response, Captain Porter, Investigator Floyd, and Patrol Officer Lawrence Gibson drove to the lot *Page 60 
behind Grayson Hall to investigate. The caller had given no description of the persons involved, but Investigator Floyd testified that he was told by Captain Porter that a gray colored vehicle and a burgundy or maroon colored vehicle were involved.
Upon their arrival at Grayson Hall, the officers saw a gray Jeep Cherokee and a maroon Ford Mustang in the parking lot. The officers approached the Mustang, in which, Investigator Floyd testified, he could see two persons sitting, and Floyd asked the driver to step out of the car. The driver told Investigator Floyd that his name was Reginald Lightfoot. Investigator Floyd conducted a patdown search of Mr. Lightfoot and felt a hard object in the left front pocket of Lightfoot's jacket. Investigator Floyd removed the object and discovered that it was a sum of cash folded in half and bound with a rubber band. Floyd put the money in his shirt pocket and went to question the passenger of the Mustang; she identified herself as Marlo Drake. Ms. Drake was questioned, but the questioning produced no information relating to a drug transaction.
Investigator Floyd then approached Mr. Lightfoot and inquired as to the ownership of the Mustang. Mr. Lightfoot responded by saying that he had recently purchased the car for $3,500, but that he had not yet had an opportunity to register it. Mr. Lightfoot testified in his deposition that he told Investigator Floyd that two to three weeks earlier he had withdrawn the money from his bank to pay for the car, and that he had saved the money from afterschool jobs, but that he was unemployed at the time. Mr. Lightfoot also testified that, when questioned as to the cash taken by Investigator Floyd, he answered that he had received $1,500 from his aunt, had received some money from his grandparents and his mother, and had saved money from previous jobs.
Investigator Floyd then contacted a dispatcher for the City of Huntsville Police Department and requested a "K-9" (dog) drug detection unit. Investigator Floyd placed the cash taken from Mr. Lightfoot under the dashboard of the Mustang, but did not disclose this fact to the officers of the drug detection unit. The dog was allowed inside the car and indicated that it smelled drugs in the area where the cash was hidden. Investigator Floyd testified that the dog's alert to the place where the money was hidden indicated that the money had drug residue on it. There is conflicting evidence as to whether Mr. Lightfoot consented to the search of the vehicle. At some point during the search of the car, Chief Smith drove to Grayson Hall and observed the scene.
Mr. Lightfoot and Ms. Drake were taken to the Alabama A M Public Safety office and detained for questioning. Mr. Lightfoot testified that he was kept there for four or five hours. Investigator Floyd testified that during this questioning Mr. Lightfoot gave conflicting stories regarding where he got the cash that was taken from him and gave conflicting stories regarding the ownership of the Mustang. The details of the conflicting stories given to Investigator Floyd on March 18 are not contained in the record.
No drugs were found in the car or on either Mr. Lightfoot's person or Ms. Drake's person. Neither Mr. Lightfoot nor Ms. Drake was charged with any offense, and Investigator Floyd denies that they were ever formally arrested. Investigator Floyd testified that he did not return the money or the car on March 18, but held it pending further investigation, because of the conflicting stories.
Investigator Floyd testified that Mr. Lightfoot returned to the Alabama A M Public Safety office on March 20, 1992, and told Floyd that the drug detection dog may have alerted to the money because Lightfoot had gotten some of the money from his aunt, who, he said, sold drugs. Mr. Lightfoot denies ever having told Floyd that his aunt was a drug dealer or that the money may have had drug residue on it. Investigator Floyd testified that on March 20 Lightfoot also stated that the Mustang belonged to his cousin, Cheryl Smith, and that he had borrowed the vehicle on March 18 to drive to the campus. Floyd stated that Mr. Lightfoot left the Public Safety office, but returned later that day with Cheryl Smith. According to Investigator Floyd, Ms. Smith stated that she owned the Mustang, but she declined to sign a statement concerning ownership of the *Page 61 
car. Investigator Floyd also testified that Mr. Lightfoot returned to the Public Safety office on March 21, 1992, and stated that the Mustang actually belonged to him and that he had registered it in Ms. Smith's name because he believed that he was not old enough to register the car in his own name. Investigator Floyd did not return the money or the automobile.
Mr. Lightfoot's attorney, on Mr. Lightfoot's behalf, wrote a letter on April 23, 1992, to Dr. Henson, informing him of the seizure of Mr. Lightfoot's money and automobile and alleging that the seizure was a violation of the University's policies and procedures and a violation of Mr. Lightfoot's constitutional rights. The letter demanded return of the seized items. The letter is stamped "received" April 24, 1992, but Dr. Henson denies any personal recollection of reading the letter. Louis Cunningham, then legal counsel to the president of Alabama A M, acknowledged receipt of the April 23 letter in a letter to Mr. Lightfoot's attorney dated April 27, 1992. The April 27 letter indicated "cc: Dr. David Henson," but Dr. Henson denies any personal recollection of reading the letter. Mr. Cunningham also wrote to Mr. Lightfoot's attorney on May 11, 1992, to inform her that Investigator Floyd had filed with the district attorney's office a report of a seizure for condemnation of the property mentioned in the April 23 letter. The May 11 letter indicated "cc: Dr. David Henson," but Dr. Henson denies any personal recollection of reading the letter.
On April 1, 1992, Investigator Floyd filed a "Report to District Attorney on Seizure for Condemnation" with the Madison County district attorney's office. At some time before May 14, 1992, that office notified Investigator Floyd that it would not bring a forfeiture action.[1] Investigator Floyd testified that he contacted a United States Drug Enforcement Agency office in Birmingham, Alabama, sometime "around the first of April of 1992" concerning a federal forfeiture action, that the office expressed interest initially, but that because of the recent murder of one of its agents it could not devote resources to such an action and recommended contacting the D.E.A. office in New Orleans, Louisiana. The exact date and the content of these communications is not evident from the record. It is evident, however, that on June 1, 1992, Investigator Floyd sent a letter and the case file to D.E.A. Agent Ron Stark in New Orleans. The letter to the D.E.A. notes that employees of the Alabama A M Department of Public Safety had been served on May 26, 1992, with a complaint and a summons in an action by Mr. Lightfoot. Also on June 1, 1992, Investigator Floyd sent Chief Smith a memorandum advising him that materials had been sent to New Orleans.
In his May 27, 1993, deposition, Investigator Floyd stated that, so far as he knew, there had not been a forfeiture action filed in any court, but that "Mr. Lightfoot, Mr. Lightfoot's vehicle, [and] Mr. Lightfoot's money [were] still part of an ongoing investigation by the California Bureau of Investigation, the U.S. Secret Service, the Federal Bureau of Investigation, the Drug Enforcement Agency, and Alabama A M University."
The automobile seized from Mr. Lightfoot was initially kept within the fence at the Alabama A M Department of Physical Facilities; while it was there, it was broken into and its contents, including a stereo system, were stolen. The vehicle was then moved to Mayall Wrecker Service for safekeeping. Sometime during March, April, or May 1993, the car was released to Investigator Floyd, after Alabama A M had paid the wrecker service approximately $800 for the storage. Floyd testified that his investigation revealed one of the former owners of the Mustang to be Rodney Arms. Mr. Arms was allegedly involved in drug activity at Alabama A M. According to Floyd, the F.B.I. arrested Arms on December 5, 1992, for trafficking in cocaine. Subsequent to Arms's arrest, the Mustang was transferred by *Page 62 
Floyd to the F.B.I.'s custody, to aid in the F.B.I.'s investigation. Arms was indicted in the United States District Court for the Northern District of Alabama on July 30, 1993; he subsequently pleaded guilty to conspiracy to possess cocaine for distribution. Investigator Floyd stated in his affidavit that it was his understanding that the F.B.I. returned the Mustang to Mr. Lightfoot "in the Fall of 1993." The actual date of return is not evident from the record, but it appears that the Mustang was in the custody of Alabama A M and the F.B.I. for approximately 15-18 months. There is no explanation as to why the car was returned.
The money seized from Mr. Lightfoot was kept initially in Investigator Floyd's personal evidence locker at his residence, and it was subsequently moved to his personal evidence locker on the Alabama A M campus. The money was turned over to Mr. Lightfoot's attorney on March 1, 1994. Thus, the money was in the personal custody of Investigator Floyd for 23 1/2 months. There is no explanation as to why the money was returned.
On May 21, 1992, Mr. Lightfoot brought an action in the Circuit Court for Madison County against Dr. Henson, Chief Smith, and Investigator Floyd, alleging various claims. The circuit court subsequently granted a motion to dismiss all defendants in their official capacities and defendants Dr. Henson and Chief Smith in their individual capacities, and allowing Mr. Lightfoot leave to amend his complaint regarding the alleged causes of action against Investigator Floyd in his individual capacity. Mr. Lightfoot then filed an amendment to his complaint, labeled "Amendment One to Complaint." In it he renewed his allegations against Dr. Henson and Chief Smith and added claims pursuant to 42 U.S.C. § 1983 arising from alleged violations of his constitutional rights.
The action was removed to a federal district court, based upon the federal court's original jurisdiction over the § 1983 claims. Mr. Lightfoot filed a second, and final, amendment to his complaint, entitled "Amendment Two to Complaint." This amendment, "in the interest of clarity and convenience," merged "all previous Complaints, and Amendments thereto." The complaint stated various claims against Dr. Henson, Chief Smith, and Investigator Floyd, including conversion, false imprisonment, defamation, slander of title, negligence, and, under § 1983, illegal search and seizure and denial of procedural and substantive due process. Mr. Lightfoot's § 1983 claims basically alleged a wrongful search of his person and the automobile; wrongful seizure of the cash, the automobile, and his person; wrongful detention of the property; and wrongful expulsion from Alabama A M. The defendants filed motions for summary judgment; the court granted those motions as to the claims arising under § 1983. See memorandum opinion of Judge Edwin L. Nelson entered in Reginald Lightfoot v. JimFloyd, et al., (CV-92-N-2060-NE, Nov. 1, 1993) (N.D.Ala. 1993).
As to Dr. Henson and Chief Smith, the federal district court held that Mr. Lightfoot "failed to show such personal involvement of Henson and Smith or the causal connection between their conduct and the alleged deprivation of Lightfoot's constitutional rights sufficient to withstand the defendants' motion for summary judgment."[2] As to Investigator Floyd, the federal district court held: that the patdown search of Mr. Lightfoot, the K-9 search of the automobile, and the initial seizure of the money and the car were not objectively unreasonable, and, therefore, were actions entitled to qualified immunity; that the retention of the money and the car did not constitute a violation of substantive due process, because the conduct did not "shock the conscience" and did not constitute a violation of procedural due process because a meaningful postdeprivation remedy existed in a state-law action for conversion; that Mr. Lightfoot had failed to produce evidence supporting his claim that his alleged expulsion constituted a violation of substantive due process; and that that alleged expulsion did not constitute a violation of procedural due process because a meaningful postdeprivation remedy existed in Alabama A M's institutional procedures. The *Page 63 
federal district court remanded the state-law claims.
Upon remand, Dr. Henson and Chief Smith filed a motion for summary judgment, arguing that the fact of their lack of personal participation in the conduct underlying the remaining state law claims had been judicially determined by the federal district court. Investigator Floyd filed a motion for summary judgment, arguing that the federal district court had judicially determined that he was entitled to qualified immunity for discretionary functions as to the conduct underlying Mr. Lightfoot's remaining state law claims. The circuit court granted the defendants' motions as to all claims.
 Collateral Estoppel
Dr. Henson, Chief Smith, and Investigator Floyd rely uponRoden v. Wright, 646 So.2d 605 (Ala. 1994), to support their argument that the doctrine of collateral estoppel operates to prevent this Court from reaching certain issues, such as the personal participation of Dr. Henson and Chief Smith and the qualified immunity of Investigator Floyd. In Roden, the chairman of the Marshall County Commission wrote a letter to Gold Kist, Inc., to express a particular community's opposition to a proposed poultry farm in the area, which Gold Kist planned to stock with broiler chickens. The would-be poultry farmer brought an action in a federal district court against the chairman and others, alleging violations of his constitutional rights and seeking damages under 42 U.S.C. § 1983, and alleging claims based upon state law, including slander of title and unlawful interference with a business relationship. On appeal from the district court's denial of the chairman's motion for summary judgment, the Eleventh Circuit Court of Appeals held that the chairman was entitled to qualified immunity and ordered the district court to enter a summary judgment in his favor. The district court entered a summary judgment and dismissed the remaining state law claims without prejudice.
Subsequently, the plaintiff brought an action in the Circuit Court for Marshall County, again alleging slander of title and unlawful interference with a business relationship. After this Court decided an appeal concerning the applicable statute of limitations, see Roden v. Wright, 611 So.2d 333 (Ala. 1992), the circuit court granted the defendants' motions for summary judgment. In the second appeal, the chairman argued that he was entitled to qualified immunity because his corresponding with Gold Kist was a discretionary act. See DeStafney v. Universityof Alabama, 413 So.2d 391 (Ala. 1981) (adopting the standard of qualified immunity for public officers prescribed inRestatement (Second) of Torts § 895D (1974)). Further, he argued that the holding of the Eleventh Circuit, that he was entitled to qualified immunity on the § 1983 claims, necessarily resolved the immunity issue as to the state-law claims.
This Court agreed that the Eleventh Circuit had previously made the necessary factual findings to find qualified immunity on the state-law claims. The Court stated that "[t]he Alabama doctrine of collateral estoppel precludes relitigation of anissue identical to one that was litigated by the identicalparties in a prior action, in which the issue was 'actuallylitigated' and in which a resolution of that issue wasnecessary to the judgment." Roden, 646 So.2d at 610 (citingDairyland Ins. Co. v. Jackson, 566 So.2d 723, 726 (Ala. 1990)) (emphasis in Roden). The Court found that the parties were identical and that the factual issue common to both actions was "whether [the chairman's] decision to correspond with Gold Kist was a discretionary act taken within the scope of his authority." 646 So.2d at 610. The Court took the standard for determining whether a defendant had qualified immunity as to the state-law claims from Restatement (Second) of Torts § 895D, "Public Officers" (1974):
 "(3) A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if
 "(a) he is immune because engaged in the exercise of a discretionary function. . . ."
646 So.2d at 610. The Court found that resolution of this issue had also been necessary to the judgment of the Eleventh Circuit, because, in deciding whether a public official is entitled to qualified immunity in § 1983 *Page 64 
actions, that Court of Appeals employs a two-pronged test, the first prong of which requires that the public official prove that " 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.' " 646 So.2d at 610 (quoting Rich v. Dollar, 841 F.2d 1558, 1563-64
(11th Cir. 1988), quoting Zeigler v. Jackson, 716 F.2d 847, 849
(11th Cir. 1983)). Thus, the Court held: "Because this issue was squarely presented to, and was necessarily decided by, the Court of Appeals for the Eleventh Circuit, the doctrine of collateral estoppel bars its relitigation in this Court." 646 So.2d at 610-11.
In light of the principles of collateral estoppel and qualified immunity generally discussed in Roden as set out above, we will discuss the issues in this case separately as they apply to each claim, and to each defendant as to a particular claim.
 Conversion
"The owner of personalty is entitled to possession thereof. Any unlawful deprivation of or interference with such possession is a tort for which an action lies." Ala. Code 1975, § 6-5-260. Mr. Lightfoot alleged in his complaint that the "seizure and retention of his personal property unlawfully interfered with his possession of, and deprived him of the same." Investigator Floyd argues that he is entitled to qualified immunity for the acts of seizing and retaining the money and the automobile, and that the issue of qualified immunity as to these acts was previously decided by the federal district court. Dr. Henson and Chief Smith argue that their lack of personal involvement in the acts allegedly constituting conversion has been previously decided by the federal district court, and, in the alternative, that they are entitled to qualified immunity for the exercise of discretionary functions.
The federal district court held that Investigator Floyd's initial seizure of Mr. Lightfoot's money and his automobile was an act entitled to qualified immunity.[3] However, regarding the claim that Floyd's continued retention of the money and the car was a violation of procedural due process, the federal district court held that there was no violation, because, it held, Mr. Lightfoot's state law cause of action for conversion constituted a "meaningful postdeprivation remedy." Thus, the question of qualified immunity as to Floyd's retention of the money and the car was not decided by the federal district court, and the doctrine of collateral estoppel is, therefore, inapplicable. See Roden, supra.
The question whether a public official is entitled to qualified immunity is one to be decided as a matter of law.White v. Birchfield, 582 So.2d 1085 (Ala. 1991); Grant v.Davis, 537 So.2d 7 (Ala. 1988). Qualified immunity is an affirmative defense that the defendant must raise and prove, and upon a defendant's motion for summary judgment the burden is on the defendant to show that his acts are entitled to such immunity. Phillips v. Thomas, 555 So.2d 81 (Ala. 1989). As we noted above, the Restatement's formulation of the rule of qualified immunity, adopted by this Court in DeStafney, supra, states:
 "(3) A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if
 "(a) he is immune because engaged in the exercise of a discretionary function. . . ."
The question whether the public official was "engaged in the exercise of a discretionary function" arises only if the public official was acting within his or her authority to begin with. This Court has held: *Page 65 
 "An individual cannot justify a tort on a contention that it is for the state, if the state had no such right. If the state had the right, then its officers, acting by its authority, were justified. The officers cannot be justified upon a mistaken notion of state authority. . . . If in the promotion of the state's business its officers without authority of law apply private property to the state's enterprises, they are guilty of the same nature of wrong, as if they were acting as agents of a private corporation."
Finnell v. Pitts, 222 Ala. 290, 293, 132 So. 2, 4 (1930).
In this case, whether Investigator Floyd's retention of the money and the car was beyond his authority or the authority of the State is closely related to the issue whether the retention was ministerial as opposed to discretionary. The interrelationship arises because, if there is a point at which Floyd no longer had the authority to retain Mr. Lightfoot's property, then the continued retention of the property could not be justified as a discretionary act within the scope of Floyd's authority, and the return of the property would be a required, ministerial act.
Thus, the essential question is whether there is some color of authority under which Investigator Floyd could lawfully retain possession of the seized money for 23 1/2 months and the automobile for approximately 15-18 months. Floyd has testified at various times as to basically two reasons for which he retained the money and the car: that the items were retained as part of an investigation of the items themselves and an investigation of Mr. Lightfoot's connection to suspected drug activity on the Alabama A M campus; and that the items were retained for forfeiture, the money as suspected drug proceeds and the car as having been purchased with drug proceeds.[4]
Regarding the investigation rationale, we are aware of no basis of authority, and none has been argued, that could justify retaining custody of the money for nearly two years because of an investigation of the money, of Mr. Lightfoot, or of his acquaintances. The investigation rationale might support the initial retention of the car because of Mr. Lightfoot's inconsistent statements regarding the ownership of the car. That issue, however, was capable of resolution and, indeed, was resolved months before Floyd's release of the car to the F.B.I.[5] At one point in his testimony, Investigator Floyd refers to an "investigative hold" on the money and the car. We have not been cited any authority supporting such a police procedure under the circumstances of this case. If the procedure does exist, the hold certainly would have to be temporary and based upon objectively identifiable criteria. Thus, an investigation of the property or of its owner does not, on the facts of this case, establish any basis of authority to retain custody of the money or the car for the length of time that the items were held.
As to the forfeiture rationale, Alabama law provides:
"(a) The following are subject to forfeiture:
". . . .
 "(4) All moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance in violation of any law of this state; all proceeds traceable to such an exchange; and all moneys . . . used or intended to be used to facilitate any violation of any law of this state concerning controlled substances;
 "(5) All conveyances, including . . . vehicles, . . . which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of any [controlled substances];
". . . . *Page 66 
 "(b) Property subject to forfeiture under this chapter may be seized by state, county or municipal law enforcement agencies upon process issued by any court having jurisdiction over the property. Seizure without process may be made if:
". . . .
 "(4) The state, county or municipal law enforcement agency has probable cause to believe that the property was used or is intended to be used in violation of this chapter.
 "(c) In the event of seizure pursuant to subsection (b) of this section, proceedings under subsection (d) of this section shall be instituted promptly.
 "(d) Property taken or detained under this section shall not be subject to replevin but is deemed to be in the custody of the state, county or municipal law enforcement agency subject only to the orders and judgment of the court having jurisdiction over the forfeiture proceedings. . . ."
Ala. Code 1975, § 20-2-93. The seizure in this case was "without process" and, consequently, was subject to the requirement of a prompt institution of forfeiture proceedings. "The mandate in the statute that forfeiture proceedings be instituted promptly
is necessary to the statute's constitutionality." Reach v.State, 530 So.2d 40, 41 (Ala. 1988) (citing Kirkland v. Stateex rel. Baxley, 340 So.2d 1121 (Ala.Civ.App. 1976), cert.denied, 340 So.2d 1127 (Ala. 1977)) (emphasis original); accordWoods v. Reeves, 628 So.2d 563 (Ala. 1993); Adams v. State exrel. Whetstone, 598 So.2d 967 (Ala.Civ.App. 1992). What is "prompt" is decided on the facts of a given case, but a fairly short time frame is evident from the cases addressing the issue. See Woods v. Reeves, supra (four years is not prompt);Reach v. State, supra (four weeks is prompt, but eight months is not prompt); $1,113.77 United States Currency v. State,606 So.2d 151 (Ala.Civ.App. 1992) (seven months is not prompt);Adams v. State ex rel. Whetstone, supra (four weeks is prompt, but 10 weeks is not prompt); Eleven Automobiles v. State exrel. Graddick, 384 So.2d 1129 (Ala.Civ.App. 1980) (four weeks is prompt); Winstead v. State, 375 So.2d 1207 (Ala.Civ.App. 1979), cert. denied, 375 So.2d 1209 (Ala. 1979) (three and one-half weeks is prompt).
Mr. Lightfoot's money was retained for 23 1/2 months and his car for approximately 15-18 months, and no forfeiture action was ever brought in any court. We hold that, if a forfeiture action had been brought pursuant to § 20-2-93 against the money and the car independently and at the respective times that the items were returned, such actions would not have been "instituted promptly," as the statute requires. Very generally, our cases hold that an action brought within a month is prompt, but we have located no cases suggesting that the periods of time involved in this case would be considered prompt. Further, no argument has been made that such an action could be considered prompt under the particular circumstances of this case. It follows from the general principle — requiring the prompt institution of forfeiture proceedings to constitutionally validate a seizure without process — that a forfeiture proceeding that is not instituted promptly is ineffectual. See Reach v. State, supra. Thus, if forfeiture actions had been brought at the respective times when the items were returned, they would have been ineffectual. Because any forfeiture action after such a length of time would have been ineffectual, we conclude that Investigator Floyd had no authority to retain custody of the items seized for such a length of time.
Clearly, a police officer in the exercise of good faith possesses the discretion to retain custody of seized items for as long as the time period in which a forfeiture action could be "instituted promptly," if it reasonably appears that such a proceeding will be instituted. Here the local district attorney's office notified Investigator Floyd within two months after the seizure that it would not institute a forfeiture action. If these were the only facts, it would be clear that, at the point when such notice was received, the prompt return of the money and the car would have been a required, ministerial act. The issue, though, is whether the added element of the D.E.A.'s interest in a federal forfeiture provided Floyd with the discretionary *Page 67 
authority to retain the items. We hold that it did not.
Investigator Floyd testified in his deposition and affidavit that, shortly after the district attorney's office notified Floyd that it would not bring a forfeiture action, a representative from the Birmingham D.E.A. office was to come to Alabama A M to meet with him concerning a federal forfeiture action, but that, because of the murder of a D.E.A. agent in Birmingham and the subsequent investigation, the meeting never occurred. Floyd testified that the Birmingham office referred him to the D.E.A. office in New Orleans.[6] The June 1, 1992, memorandum from Investigator Floyd to Chief Smith advising Smith that the case file had been sent to New Orleans states, in pertinent part:
 "I spoke to Agent Stark . . . and was advised to send a copy of our request for seizure to the New Orleans office as soon as possible for immediate action by the DEA. [Agent Stark] has assured me that the Civil Suit by Mr. Lightfoot's attorney is par for the course and that he foresees no problems. However, the only factor in pursuing this matter is time. This must be completed prior to 17 June 1992. . . . [Agent Stark] also advised that one of the Agents would be in our office as soon as possible regarding this matter to discuss their course of action and to relieve us of the property."
The D.E.A. never assumed custody of the money or of the car. In fact, Investigator Floyd testified that he was notified by D.E.A. that its policy was not to institute a forfeiture action where the property subject to forfeiture was involved in a pending lawsuit. Floyd testified that he was told to contact the D.E.A. when the present lawsuit was resolved. Although these latter communications apparently occurred after the June 1 memorandum to Chief Smith was written, the exact date is unclear. It is clear that the D.E.A. initially expressed the importance of moving quickly on the forfeiture, that the D.E.A. never assumed custody of the seized items, and that Investigator Floyd was aware that no forfeiture action would be brought by the D.E.A. until there had been a resolution of the present action.
We conclude, on the basis of these facts, that, even if Investigator Floyd's communications with the D.E.A. left him with the impression that a forfeiture action would be brought after the termination of this litigation, that impression did not give him the authority to retain custody of the money and the car. It would be a different matter had the D.E.A. assumed custody of the items after receiving the reports from Investigator Floyd; Floyd was clearly exercising discretionary functions in working with the D.E.A. toward a forfeiture. However, because the D.E.A. did not assume custody of the money and the car, the law applicable to federal forfeiture is not implicated and the scope of Investigator Floyd's authority concerning the retention of the seized items is controlled by Alabama law. Alabama law requires that forfeiture actions be instituted promptly for items seized for forfeiture without process. This is a requirement that is necessary to the constitutionality of such seizures. Therefore, Floyd's retention of the money and the car beyond the time in which a forfeiture action could have been "instituted promptly" in a state court and after it was apparent that no federal forfeiture action was forthcoming was beyond his authority and beyond the authority of the State. Consequently, as to Mr. Lightfoot's claim alleging conversion, Floyd is not entitled to qualified immunity for the exercise of a discretionary function within the scope of his authority.
Because Mr. Lightfoot has stated a cause of action for conversion against Investigator Floyd and Floyd did not establish that he was entitled to qualified immunity as a matter of law, the summary judgment for Floyd on this claim was improper.
The federal district court held that a summary judgment was proper as to Dr. Henson and Chief Smith as to all claims arising under § 1983 because the doctrine of respondeat superior is not applicable in § 1983 actions and the defendants had no personal participation in the conduct alleged to constitute violations of Mr. Lightfoot's constitutional rights. Mr. Lightfoot alleges in the *Page 68 
conversion claim that Dr. Henson and Chief Smith were responsible for Investigator Floyd's actions and that they ratified the retention of Mr. Lightfoot's money and car by not ordering the return of the items. Dr. Henson and Chief Smith argue that their lack of personal involvement in the acts allegedly constituting conversion has been previously decided by the federal district court, and, in the alternative, that they are entitled to qualified immunity for the exercise of discretionary functions within the scope of their authority. Because Mr. Lightfoot's theory of conversion as to Dr. Henson and Chief Smith does not require that these defendants be found to have actually seized and retained the money and the car, but that each had the authority to order the return of the items and did not, the federal district court's conclusion that they did not personally participate in the initial seizure of the property does not invoke the doctrine of collateral estoppel as to the issue. See Roden, supra. The issue, then, is whether the defendants are entitled to qualified immunity.
In his deposition, Dr. Henson disclaimed any personal knowledge of the initial search of Mr. Lightfoot or the seizure of the money and the car. It is evident from the record, however, that Dr. Henson's office received correspondence demanding a return of Mr. Lightfoot's property and that Dr. Henson's legal counsel sent Dr. Henson copies of his correspondence with Mr. Lightfoot's attorney. Dr. Henson stated in his deposition that he would have delegated any such matter to his legal counsel and that the responses by Mr. Cunningham, Dr. Henson's legal counsel, to the letters from Mr. Lightfoot's attorney are evidence of delegation of this matter.
Dr. Henson, as president of Alabama A M, is responsible for the overall supervision of the University and its faculty and other employees. That supervision must necessarily be exercised with a large measure of discretion. Dr. Henson was notified that Mr. Lightfoot's property had been seized and that he claimed that the seizure was unlawful. In an exercise of discretion within the authority of a university president, Dr. Henson delegated the matter to his legal counsel. This was an act entitled to qualified immunity as the exercise of a discretionary function.
Chief Smith was aware of the incident with Mr. Lightfoot; he received the first call from the dispatcher and he was present for a period of time behind Grayson Hall while the Ford Mustang was being searched. Smith stated in his May 20, 1993, deposition that he did not know why the money and the car were being held by Investigator Floyd, but that he was aware of the seizure of the money and the car and that he told Investigator Floyd to keep him apprised of the investigation. In portions of his deposition, Smith downplays any direct involvement in the oversight of Investigator Floyd's investigation. However, it is clear that, as the Department of Public Safety's only investigator, Floyd reported directly to Smith on investigatory matters. In fact, Floyd's June 1, 1992, memorandum to Smith concerning Floyd's communications with the D.E.A. in New Orleans states, "After review the DEA will at the very least call you and advise you of their progress." Smith essentially alleges ignorance of the matter while acknowledging that he was Investigator Floyd's direct supervisor, was aware of Mr. Lightfoot's claims, and was to receive reports directly from the D.E.A. We have determined that, as a matter of law, Investigator Floyd is not entitled to qualified immunity, because there was no color of authority under which he could lawfully retain possession of Mr. Lightfoot's money and car for such a length of time. Therefore, Chief Smith's apparent decision not to order the return of the money and the car, in the face of his specific knowledge of the matter, is not an exercise of a discretionary function within the scope of his authority. As to the conversion claim against Chief Smith, the summary judgment was improper.
 False Imprisonment
"False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code 1975, § 6-5-170. Mr. Lightfoot averred in the count alleging false imprisonment that "Investigator Floyd *Page 69 
. . . seized and detained [Mr. Lightfoot's] person, placing him in a Huntsville City Police vehicle and transporting him to the [Alabama A M] 'Police Station' where he was detained and questioned for 4-5 hours, and that said acts unlawfully deprived him of his personal liberty." Mr. Lightfoot averred in the count alleging illegal search and seizure as part of the § 1983 claim that "Investigator Floyd . . . illegally seized [Mr. Lightfoot's] person, his vehicle and the contents therein, and his money without an arrest warrant." The federal district court did not specifically address the allegedly unlawful seizure of Mr. Lightfoot's person, but it did hold that Investigator Floyd's initial seizure of the money and the automobile was a discretionary act entitled to qualified immunity.[7]
The initial seizure of the money and the automobile and the detention of Mr. Lightfoot for questioning were in response to common circumstances and were related acts. Mr. Lightfoot has presented no argument as to why his detention for questioning was any less of a discretionary act lying within the scope of Investigator Floyd's authority than the acts expressly determined to be discretionary by the federal district court. Because the district court concluded that there were no viable § 1983 claims, it could be argued that the court decided, sub silentio, that Investigator Floyd was acting within the scope of his discretionary authority in detaining Mr. Lightfoot for questioning. The resolution of that exact question, however, is unnecessary, because we are persuaded that Investigator Floyd was exercising a discretionary function in detaining Mr. Lightfoot for questioning and is therefore entitled to qualified immunity from the claim of false imprisonment.
There are no allegations against Dr. Henson or Chief Smith relating to the claim of false imprisonment.
 Defamation
Mr. Lightfoot's complaint alleges that:
 "Investigator Floyd . . . publicly searched and seized [Mr. Lightfoot's] person, money, automobile, and the contents therein, and placed him in a City of Huntsville Police vehicle which transported him to the campus 'police station'; and . . . Investigator Floyd, . . . Chief Smith and Dr. Henson, through his agent Attorney Cunningham, subsequently communicated information, orally and/or in writing, concerning the circumstances of the aforesaid search and seizure and his expulsion from the campus; and . . . said communications falsely portrayed him as a 'Drug Dealer' and his money and vehicle as fruits of drug transactions; and . . . said communication constitutes libel and slander, and/or libel and slander per se, pursuant to the Code of Alabama 1975, §§ 6-5-180 through -189."
As to Investigator Floyd, the federal district court concluded that the search of Mr. Lightfoot and his automobile and the initial seizure of the money and the automobile were entitled to qualified immunity as discretionary actions that were not objectively unreasonable. Thus, Mr. Lightfoot is estopped from relitigating the issue of qualified immunity as to these actions. Roden, supra. We have concluded above that transporting Mr. Lightfoot to the Alabama A M police station, as part of the detention of Mr. Lightfoot for questioning, was the exercise of a discretionary function and was entitled to qualified immunity. The issue, then, is whether Investigator Floyd's communications concerning the circumstances of the search and seizure and of the alleged expulsion constitute defamation. Mr. Lightfoot, however, does not establish in the submissions to the circuit court found in the record or show in the briefs to this Court that any of Investigator Floyd's communications are or could be defamatory; there is no reference to particular written communications or to the substance of any oral conversations in which Mr. Lightfoot may have been characterized as a "drug dealer." Any of Investigator Floyd's communications that are reproduced in the record, such as the Alabama Uniform Incident Report or the case report to the D.E.A. in New Orleans, would very likely be entitled to qualified immunity, because the making of *Page 70 
such reports is usually a discretionary function squarely within the scope of a police officer's authority. Therefore, there is no evidence to support Mr. Lightfoot's claim of defamation, and the summary judgment was proper as to that claim against Investigator Floyd.
Similarly, as to Dr. Henson and Chief Smith, the allegations and the evidence are simply insufficient to support a cause of action for any type of defamation; Mr. Lightfoot identifies no specific communications. The communications reproduced in the record would very likely be entitled to qualified immunity, and there are serious doubts as to whether the requirement of publication to a third party would be met here. See Burks v.Pickwick Hotel, 607 So.2d 187 (Ala. 1992); Nelson v. LapeyrouseGrain Corp., 534 So.2d 1085 (Ala. 1988). Therefore, the summary judgment was also proper as to this claim against Dr. Henson and Chief Smith.
 Slander of Title
Section 6-5-211, Ala. Code 1975, provides that "[t]he owner of any estate in lands may commence an action for libelous or slanderous words falsely and maliciously impugning his title." The statute expressly applies to title to "any estate in lands," and the cause of action created by this section has been applied by this Court to title to real property. SeeAlabama Power Co. v. Laney, 428 So.2d 21 (Ala. 1983). Mr. Lightfoot makes no argument why this statute should apply to the facts in this case, where there is no issue as to title to "any estate in lands." Therefore, the summary judgment was proper on this claim as to all defendants.
 Negligence
Mr. Lightfoot alleges that the defendants' duties are prescribed in title 16, chapter 49, of the 1975 Alabama Code and in the Alabama A M student handbook, Life on the Hill, and that the defendants "breached their duties by depriving Plaintiff of his Constitutionally protected rights and/or by failing to protect or restore Plaintiff's Constitutionally protected rights, in violation of the Constitution of Alabama of 1901 and the Constitution of the United States," and Mr. Lightfoot states, "Said Constitutional rights are set forth hereinafter in the paragraph captioned TITLE 42, SECTION 1983." There is no allegation that rights uniquely protected by the Alabama Constitution were violated. Thus, Mr. Lightfoot's allegation of negligence is inherently tied to the § 1983 claims previously addressed by the federal district court. As noted above, the district court held that there was no violation of federal constitutional rights and it entered a summary judgment for all defendants on the § 1983 claims. Therefore, the circuit court properly entered the summary judgment for all defendants on the negligence claim.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
HORNSBY, C.J., and SHORES, KENNEDY, COOK, and BUTTS, JJ., concur.
HOUSTON, J., concurs specially.
[1] The exact date is not evident from the record. It is clear that an assistant district attorney informed Mr. Lightfoot's attorney by way of a letter dated May 14, 1992, that a forfeiture action had not been brought and that the file had been sent back to Investigator Floyd. Investigator Floyd stated in his deposition that his recollection was that the reason provided by the district attorney's office for not bringing a forfeiture action was basically that there was not enough evidence.
[2] The court noted that the theory of respondeat superior is not available to establish a claim under § 1983 (citing Dean v.Barber, 951 F.2d 1210 (11th Cir. 1992)).
[3] Specifically, the court held that Mr. Lightfoot had failed to show that such conduct was "objectively unreasonable." The "objectively unreasonable" standard is employed by the federal courts in determining whether a public official's actions "violated clearly established constitutional law," which is the second prong of the test used in deciding whether a public official is entitled to qualified immunity in a § 1983 action.See Lightfoot v. Floyd, supra; Zeigler, supra. In reaching the second prong of the test for qualified immunity in § 1983 claims, the court must have concluded that the initial seizure of the money and the car was within Investigator Floyd's discretionary authority. See Roden, supra. Thus, the doctrine of collateral estoppel prevents relitigation of this issue. Id.
[4] The latter reason stems from Investigator Floyd's allegation that Mr. Lightfoot stated that his aunt sold drugs, that he had received money from his aunt to purchase the car, and that the drug detection dog may have alerted to the cash because he had received some of it from his aunt. The money was never tested for drug residue.
[5] The record contains copies of Mr. Lightfoot's application for a certificate of title for the Ford Mustang and his motor vehicle registration tag and tax receipt for it, both dated November 3, 1992. This was 5-7 months before the car was released to the F.B.I.
[6] The record contains no correspondence from either of the D.E.A. offices to Investigator Floyd.
[7] See note 3, supra.